IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| EPSILON ENERGY USA, INC. | : | CIVIL ACTION NO. _____ |
|  | : |  |
| Plaintiff, | : | **PLAINTIFF EPSILON ENERGY USA,** |
|  | : | **INC.'S COMPLAINT** |
| v. | : |  |
|  | : |  |
| SOUTHWESTERN OIL CO., and | : |  |
| WESTERN LAND SERVICES, INC., | : |  |
|  | : |  |
| Defendants. | : | **JURY TRIAL DEMANDED** |

## <u>PLAINTIFF EPSILON ENERGY USA, INC.'S COMPLAINT</u>

Plaintiff Epsilon Energy USA, Inc. ("Epsilon"), by and through its attorneys, K&L Gates

LLP and Harris Beach PLLC, by way of its Complaint against the above-captioned defendants,

states as follows:

### <u>THE PARTIES</u>

1.      Epsilon is an Ohio corporation with its principal place of business located at

10700 North Freeway, Suite 930, Houston, Texas 77037-1103.

2.      Defendant Southwestern Oil Company ("Southwestern") is a Michigan

corporation with its principal place of business located at 225 North Lafayette Street, Greenville,

Michigan 48838-1855.

3.      Defendant Western Land Services, Inc. ("WLS") is a Michigan corporation with

its principal place of business located at 1100 Conrad Industrial Drive, Ludington, Michigan

49431.

## STATEMENT OF JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between Epsilon and Southwestern and WLS, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

5.     Venue for this matter lies in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Epsilon's claims took place in this District.

6.     An actual controversy exists between the parties hereto within the meaning of 28 U.S.C. § 2201, *et seq.*, with respect to Epsilon's duties under a Joint Operating Agreement that was entered into among Epsilon, Southwestern, and WLS, effective August 8, 2005, a true and correct copy of which is attached hereto as Exhibit A ("JOA").

## FACTUAL BACKGROUND

7.     As discussed more fully below, the three entities and others involved in this matter have had a relatively interconnected relationship for several years that has primarily revolved around an oil and gas accumulation, commonly known as a "play," in northern New York.

### The Companies and Personnel

8.     Epsilon is the U.S. subsidiary of Epsilon Energy, Ltd., an oil and gas company involved in the production and exploration of oil and natural gas reserves throughout Pennsylvania, New York, Ohio and several foreign countries.

9.     Zoran Arandjelovic is the Executive Chairman, President, and CEO of Epsilon Energy, Ltd.

10.     Southwestern is a private oil and gas exploration and development company.

11.     Jeffery Cook is the President of Southwestern.

12.     WLS is a corporation that assists in leasing and acreage development in various oil and gas plays throughout the United States.

13.     John Wilson is the President of WLS.

14.     From March 2005 until January 2010, Mr. Wilson also served in various roles as Epsilon's Chief Operating Officer, Secretary, Director, President, Chief Executive Officer, and board member.

15.     In addition to being party to the JOA, WLS has provided various services to Epsilon, such as title review services and lease acquisition services under separate agreements.

**The Agreements**

16.     The parties' formal relationship was commenced with the execution of several agreements in 2005 to form an area of mutual interest ("AMI") covering an oil and gas play in northern New York consisting of certain oil and gas leases in Steuben, Chemung, Schuyler, Tioga and Otsego Counties, New York.

17.     On August 8, 2005, Southwestern, by its President Jeff Cook, executed a Joint Venture Agreement, effective June 1, 2005, with Epsilon, by its then President John Wilson (who is currently the President of WLS) whereby Epsilon and Southwestern formed the AMI and Epsilon acquired a 50% interest in certain oil and gas leases in the AMI and agreed to finance the development of said leases as well as the acquisition of additional leases.  A true and correct copy of the Joint Venture Agreement is attached hereto as Exhibit B.

18.     Effective August 8, 2005, Epsilon entered into a Participation and Exploration Agreement ("P&E Agreement") with Southwestern and WLS.  A true and correct copy of the P&E Agreement is attached hereto as Exhibit C.

19.     The P&E Agreement modified the Joint Venture Agreement by expanding the AMI and adding WLS as a party.

20.     Effective August 8, 2005, Southwestern entered into the JOA with Epsilon and WLS whereby Southwestern would serve as Operator for the AMI. *See* JOA, Ex. A, at Art. V.A.

21.     In October 2006, Epsilon became Operator under the JOA and Southwestern became a Non-Operator while WLS remained a Non-Operator. Southwestern and WLS are referred to collectively hereinafter as the "Non-Operators."

22.     With regard the Operator's responsibilities, the JOA states in pertinent part:

> Operator shall conduct its activities under this agreement as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct.

*See* JOA, Ex. A., at Art. V.A.

23.     The JOA also sets forth the process for removal of the Operator:

> Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice.... For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.

*See* JOA, Ex. A, at Art. V.B.

**Pooling**

24.    On or about February 23, 2010, a conference call took place among several individuals, including Jeffery Cook of Southwestern, John Wilson of WLS, Zoran Arandjelovic of Epsilon, Ramik Arandjelovic of Epsilon, and Judith Erickson, Epsilon's newly-hired land-person (the "Conference Call").

25.    On the Conference Call, a decision was made to pool certain leases in the AMI into several units which required the preparation of pooling declarations for the units.

26.    It was decided on the Conference Call that counsel would send a team to file the pooling declarations.

27.    On March 12, 2010, counsel sent Ms. Erickson and Mr. Wilson a template of a pooling declaration for one of the proposed pooled units.

28.    Included with the above noted template were instructions to modify the declaration for other units, attach exhibits, and record the declarations.

29.    Although it is classified as a Non-Operator under the JOA, WLS took on an active role in the entire pooling process.  Namely, WLS prepared the pooling declarations, exhibits, and maps.

30.    On or about March 20, 2010, WLS' Mr. Wilson sent draft pooling declarations to Epsilon's Ms. Erickson via e-mail.

31.    On or about March 24, 2010, Ms. Erickson called counsel to inquire into the validity of the size of units that WLS proposed to be pooled.

32.    Prior to March 30, 2010, WLS had not made available to Epsilon all updated maps needed to file the pooling declarations.

33.     Upon discovering that Ms. Erickson had not been sent all needed materials, WLS rushed pooling materials to Ms. Erickson via overnight mail with instructions to file because the leases on two tracts were set to expire on April 3, 2010.

34.     However, by March 30, 2010, lease rights to some of the acreage to be pooled had already expired.

35.     Moreover, the pooling declarations that WLS sent to Ms. Erickson did not conform to the declarations prepared by counsel.

36.     Upon receiving the pooling declarations, Ms. Erickson became concerned that the declarations might also violate New York law in several respects and, as a result, unnecessarily expose Epsilon to potential liability as Operator.

37.     Specifically, Ms. Erickson was concerned that the amount of pooled acreage exceeded state limits as well as the limits provided in the leases themselves, which could expose Epsilon to wrongful pooling claims.

38.     On or about April 20, 2010, Ms. Erickson again attempted to inquire with counsel as to the validity of the pooling declarations, particularly in light of the amount of acreage to be pooled.

39.     With respect to these events, Epsilon was placed in an untenable position. Faced with questionable pooling declarations, Epsilon did not immediately file the declarations.

40.     After reviewing e-mail correspondence sent by counsel on May 5, 2010 in response to her inquiries, and with time continuing to expire and more acreage hanging in the balance, Ms. Erickson sent the pooling declarations to be filed on May 6, 2010.

**Seismic Data**

41.     On or about May 10, 2010, Epsilon sent an advance billing to the Non-Operators for the purchase of certain 2D seismic data covering approximately ninety-five (95) miles of

acreage in and around the AMI (the "NY Park Place Seismic Data"), which was necessary for the development and operation of the AMI.

42.     On or about May 13, 2010, the Non-Operators sent Epsilon an e-mail rejecting the purchase of the NY Park Place Seismic Data.

43.     In May, Epsilon billed the Non-Operators for the purchase of the New York Park Place Seismic Data. *See* Accounts Receivable Summary Statement, a true and correct copy of which is attached hereto as Exhibit D.

44.     On or about June 1, 2010, Jeffery Cook e-mailed Epsilon's Ramik Arandjelovic taking the position that the bill for the New York Park Place Seismic Data was in error and would not be paid.

**Default Letter**

45.     On or about May 24, 2010, Epsilon received a letter from Jeffery Cook on behalf of the Non-Operators claiming that Epsilon was in default of its obligations under the JOA and purporting to set forth several reasons in support of this claim (the "Default Letter"). A true and correct copy of the Default Letter is attached hereto as Exhibit E.

46.     In a letter dated June 10, 2010, Epsilon responded to the Default Letter, (the "Response Letter"). A true and correct copy of the Response Letter is attached hereto as Exhibit F.

<u>**COUNT I – DECLARATORY JUDGMENT**</u>

47.     The averments of paragraphs 1 through 46 hereof are incorporated by reference as if fully set forth herein.

48.     The JOA expressly requires Epsilon to, *inter alia*, conduct its activities as Operator in compliance with applicable law.

49.     Epsilon had legitimate concerns that the pooling declarations the Non-Operators instructed it to file violated New York law and exposed it to liability in other respects.

50.     The obligation that an operator act with prudence and diligence does not require it to file questionable pooling declarations and expose itself to potential liability without first gaining relevant information.

51.     Therefore, Epsilon's refusal to immediately file pooling declarations of questionable legality does not amount to a material failure to perform its duties as Operator.

52.     In any event, even if the approximately five hundred and fifty (550) acres of leased acreage were in fact lost, this loss is a small fraction of the total acreage in the AMI that is *de minimis* and does not render Epsilon an imprudent operator, especially in light of Epsilon's good intentions to question and evaluate the implications of the pooling declarations that it was asked to file.

53.     The Default Letter raises several other allegations in support of the Non-Operators' claim that Epsilon has materially failed to meet its obligations under the JOA. *See* Default Letter, Ex. E.

54.     As set forth more fully in the Response Letter, however, the majority of the allegations in the Default Letter are bald claims unsupported by any specific factual allegations to which Epsilon could respond. *See* Response Letter, Ex. F.

55.     The remaining claims in the Non-Operators' Letter do not, either individually or in *toto*, amount to a breach of Epsilon's obligations under the JOA.

56.     Therefore, Epsilon is not in default of its obligations under the JOA, and good cause does not exist to remove Epsilon as Operator.

WHEREFORE, Epsilon respectfully requests the Court to enter a judgment in its favor declaring that Epsilon is not in default of its obligations under the JOA and that good cause does not exist to remove it as Operator, and grant Epsilon such other and further relief as the Court deems just and appropriate.

## COUNT II – PERMANENT INJUNCTION

57.     The averments of paragraphs 1 through 56 hereof are incorporated by reference as if fully set forth herein.

58.     Article V of the JOA provides for removal of the Operator for "good cause," which is defined therein as "gross negligence or willful misconduct ... [or] inability to meet the standards of operation contained in Article V.A. or material failure or inability to perform its obligations under [the JOA]."

59.     As set forth in Count I above, the claims in the Default Letter do not amount to a default of any of Epsilon's responsibilities as Operator under the JOA.

60.     However, unless enjoined by the Court, the Non-Operators are likely to attempt to remove Epsilon as Operator under the JOA.

61.     Removal as Operator will cause Epsilon immediate and irreparable harm for which there is no adequate remedy at law.

62.     Specifically, Epsilon has invested considerable time, effort, and expense in developing operations for the AMI, including significant expenditures related to, *inter alia*, staff, machinery, and subcontracts with numerous entities.

63.     Such overwhelming loss clearly tips the balance of hardship in favor of an injunction.

64.     Moreover, an injunction would serve the public interest in that removal of Epsilon as Operator would materially disrupt relations with landowners, particularly at sites where Epsilon currently has ongoing operations.

65.     Therefore, Epsilon is entitled to a permanent injunction enjoining the Non-Operators' from removing Epsilon as Operator on the basis of the claims in the Default Letter.

WHEREFORE, Epsilon respectfully requests the Court to enter a judgment in its favor enjoining the Non-Operators from removing Epsilon as Operator under the JOA on the basis of the claims made in the Default Letter, and grant Epsilon such other and further relief as the Court deems just and appropriate.

## COUNT III – BREACH OF CONTRACT

66.     The averments of paragraphs 1 through 65 hereof are incorporated by reference as if fully set forth herein.

67.     The JOA, which is a binding contract between Epsilon and the Non-Operators, provides, in pertinent part:

> Except as herein otherwise specifically provided, ***Operator*** shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and ***shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C."***

*See* JOA, Ex. A., at Art. V.D.2 (emphasis added).

68.     The charging of seismic costs is not otherwise specifically provided for in the JOA.

69.     Under the Council of Petroleum Accountants Societies ("COPAS") Accounting Procedures accompanying the JOA, "Joint Account" and "Joint Operations" are defined as follows:

    a.     "Joint Account" means the account showing the charges paid and credits received in the conduct of Joint Operations that ***are to be shared*** by the Parties....

    b.     "Joint Operations" means ***all*** operations necessary or proper for the ***exploration, appraisal*** ... of the Joint Property.

*See* JOA, Ex. A, at COPAS Accounting Procedures (Ex. C), at Art. I.1 (emphasis added).

70.     Seismic operations were necessary and proper for the appraisal of the Joint Property and its subsequent exploration.

71.     Seismic operations are also covered under the provision of the COPAS Accounting Procedures providing for the charging of "Technical Services."

72.     Article II.5 of the COPAS provides that the "Operator ***shall charge*** the Joint Account" with the cost of "third party Technical Services ... to the extent excluded from the overhead rates under Section III (Overhead)." *See* JOA, Ex. A, at COPAS Accounting Procedures (Ex. C), at Art. II.5 (emphasis added).

73.     Further, pursuant to the COPAS, third party Technical Services are excluded from the overhead rates and made chargeable directly to the Joint Account. *Id.* at Art. III.1.A.

74.     Thus, the purchase of seismic data is specifically chargeable to the Non-Operators pursuant to the JOA's COPAS Accounting Procedures.

75.     The Non-Operators materially breached their duty to contribute to the purchase of the NY Park Place Seismic Data by specifically rejecting the bills charging their proportionate shares. *See* Accounts Receivable Summary Statement, Ex. D.

76.     As a result of Non-Operators' material breach of contract, Epsilon has suffered damages in the amount of $91,321 which represents the Non-Operators' proportionate share of the charges for the NY Park Place Seismic Data.

WHEREFORE, Epsilon respectfully requests the Court to enter a judgment in its favor, award Epsilon $91,321 representing the Non-Operators' share of the cost of the NY Park Place Seismic Data, together with interest, costs and fees, including attorney's fees, and grant Epsilon such other and further relief as it deems just and appropriate.

Dated: June 17, 2010                                Respectfully submitted,

_____
Philip G. Spellane (NY 2276087)
pspellane@harrisbeach.com
Harris Beach PLLC
99 Garnsey Road
Pittsford, NY 14534
Telephone: 585-419-8638
Facsimile: 585-419-8811

Of counsel:

Walter A. Bunt, Jr. (PA 36738)
walter.bunt@klgates.com
Jared S. Hawk (PA 92959)
jared.hawk@klgates.com
Brent W. Jacobson (PA 306860)
brent.jacobson@klgates.com
K&L Gates LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222
Telephone: 412-355-6500
Facsimile: 412-355-6501

Attorneys for Plaintiff Epsilon Energy USA, Inc.

# EXHIBIT A

EXHIBIT "B"

A.A.P.L. FORM 610 - 1989

# MODEL FORM OPERATING AGREEMENT

OPERATING AGREEMENT

DATED

_____August 8_____ , __2005__ ,

OPERATOR   _Southwestern Oil Company_____

CONTRACT AREA   _Steuben, Chemung, Schuyler, Tioga and Otsego Counties, New York_

_____

_____

_____

_____

COUNTY OR PARISH OF _____ , STATE OF   _New York_

COPYRIGHT 1989 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS, 76137, APPROVED FORM.

A.A.P.L. NO. 610 - 1989

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT - 1989

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS: | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION: | 2 |
| | C. SUBSEQUENTLY CREATED INTERESTS: | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION: | 2 |
| | B. LOSS OR FAILURE OF TITLE: | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| | 4. Curing Title | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR: | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR: | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | 3. Effect of Bankruptcy | 4 |
| | C. EMPLOYEES AND CONTRACTORS: | 4 |
| | D. RIGHTS AND DUTIES OF OPERATOR: | 4 |
| | 1. Competitive Rates and Use of Affiliates | 4 |
| | 2. Discharge of Joint Account Obligations | 4 |
| | 3. Protection from Liens | 4 |
| | 4. Custody of Funds | 5 |
| | 5. Access to Contract Area and Records | 5 |
| | 6. Filing and Furnishing Governmental Reports | 5 |
| | 7. Drilling and Testing Operations | 5 |
| | 8. Cost Estimates | 5 |
| | 9. Insurance | 5 |
| VI. | DRILLING AND DEVELOPMENT | 5 |
| | A. INITIAL WELL: | 5 |
| | B. SUBSEQUENT OPERATIONS: | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less Than All Parties | 6 |
| | 3. Stand-By Costs | 7 |
| | 4. Deepening | 8 |
| | 5. Sidetracking | 8 |
| | 6. Order of Preference of Operations | 8 |
| | 7. Conformity to Spacing Pattern | 9 |
| | 8. Paying Wells | 9 |
| | C. COMPLETION OF WELLS; REWORKING AND PLUGGING BACK: | 9 |
| | 1. Completion | 9 |
| | 2. Rework, Recomplete or Plug Back | 9 |
| | D. OTHER OPERATIONS: | 9 |
| | E. ABANDONMENT OF WELLS: | 9 |
| | 1. Abandonment of Dry Holes | 9 |
| | 2. Abandonment of Wells That Have Produced | 10 |
| | 3. Abandonment of Non-Consent Operations | 10 |
| | F. TERMINATION OF OPERATIONS: | 10 |
| | G. TAKING PRODUCTION IN KIND: | 10 |
| | (Option 1) Gas Balancing Agreement | 10 |
| | (Option 2) No Gas Balancing Agreement | 11 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 11 |
| | A. LIABILITY OF PARTIES: | 11 |
| | B. LIENS AND SECURITY INTERESTS: | 12 |
| | C. ADVANCES: | 12 |
| | D. DEFAULTS AND REMEDIES: | 12 |
| | 1. Suspension of Rights | 13 |
| | 2. Suit for Damages | 13 |
| | 3. Deemed Non-Consent | 13 |
| | 4. Advance Payment | 13 |
| | 5. Costs and Attorneys' Fees | 13 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES: | 13 |
| | F. TAXES: | 13 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 14 |
| | A. SURRENDER OF LEASES: | 14 |
| | B. RENEWAL OR EXTENSION OF LEASES: | 14 |
| | C. ACREAGE OR CASH CONTRIBUTIONS: | 14 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## TABLE OF CONTENTS

|  |  |  |
|---|---|---|
| | D. ASSIGNMENT; MAINTENANCE OF UNIFORM INTEREST: | 15 |
| | E. WAIVER OF RIGHTS TO PARTITION: | 15 |
| | F. PREFERENTIAL RIGHT TO PURCHASE: | 15 |
| IX. | INTERNAL REVENUE CODE ELECTION | 15 |
| X. | CLAIMS AND LAWSUITS | 15 |
| XI. | FORCE MAJEURE | 16 |
| XII. | NOTICES | 16 |
| XIII. | TERM OF AGREEMENT | 16 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 16 |
| | A. LAWS, REGULATIONS AND ORDERS: | 16 |
| | B. GOVERNING LAW: | 16 |
| | C. REGULATORY AGENCIES: | 16 |
| XV. | MISCELLANEOUS | 17 |
| | A. EXECUTION: | 17 |
| | B. SUCCESSORS AND ASSIGNS: | 17 |
| | C. COUNTERPARTS: | 17 |
| | D. SEVERABILITY | 17 |
| XVI. | OTHER PROVISIONS | 17 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989



OPERATING AGREEMENT

1
2  THIS AGREEMENT, entered into by and between ___Southwestern Oil Company_____,
3  hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes
4  hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

5                                            WITNESSETH:

6         WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land
7  identified in Exhibit "A," and the parties hereto have reached an agreement to explore and develop these Leases and/or Oil
8  and Gas Interests for the production of Oil and Gas to the extent and as hereinafter provided,

9         NOW, THEREFORE, it is agreed as follows:

10                                            ARTICLE I.
11                                           DEFINITIONS

12         As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

13         A.   The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of
14  estimating the costs to be incurred in conducting an operation hereunder.

15         B.   The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a producer of Oil
16  and Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation
17  and production testing conducted in such operation.

18         C.   The term "Contract Area" shall mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be
19  developed and operated for Oil and Gas purposes under this agreement.  Such lands, Oil and Gas Leases and Oil and Gas
20  Interests are described in Exhibit "A."

21         D.   The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest
22  Zone in which the well was previously drilled, or below the Deepest Zone proposed in the associated AFE, whichever is the
23  lesser.

24         E.   The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the
25  cost of any operation conducted under the provisions of this agreement.

26         F.   The term "Drilling Unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal
27  body having authority.   If a Drilling Unit is not fixed by any such rule or order, a Drilling Unit shall be the drilling unit as
28  established by the pattern of drilling in the Contract Area unless fixed by express agreement of the Drilling Parties.

29         G.   The term "Drillsite" shall mean the Oil and Gas Lease or Oil and Gas Interest on which a proposed well is to be
30  located.

31         H.   The term "Initial Well" shall mean the well required to be drilled by the parties hereto as provided in Article VI.A.

32         I.   The term "Non-Consent Well" shall mean a well in which less than all parties have conducted an operation as
33  provided in Article VI.B.2.

34         J.   The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a
35  proposed operation.

36         K.   The term "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous
37  hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is
38  specifically stated.

39         L.   The term "Oil and Gas Interests" or "Interests" shall mean unleased fee and mineral interests in Oil and Gas in tracts
40  of land lying within the Contract Area which are owned by parties to this agreement.

41         M.   The terms "Oil and Gas Lease," "Lease" and "Leasehold" shall mean the oil and gas lease or interests therein
42  covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

43         N.   The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a
44  Completion in a shallower Zone.

45         O.   The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned
46  in order to attempt a Completion in a different Zone within the existing wellbore.

47         P.   The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure,
48  restore, or improve production in a Zone which is currently open to production in the wellbore.   Such operations include, but
49  are not limited to, well stimulation operations but exclude any routine repair or maintenance work or drilling, Sidetracking,
50  Deepening, Completing, Recompleting, or Plugging Back of a well.

51         Q.   The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to
52  change the bottom hole location unless done to straighten the hole or drill around junk in the hole to overcome other
53  mechanical difficulties.

54         R.   The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and
55  Gas separately producible from any other common accumulation of Oil and Gas.

56         Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes
57  natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.

58                                            ARTICLE II.
59                                            EXHIBITS

60         The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

61  __X__   A.  Exhibit "A," shall include the following information:
62                 (1) Description of lands subject to this agreement,
63                 (2) Restrictions, if any, as to depths, formations, or substances,
64                 (3) Parties to agreement with addresses and telephone numbers for notice purposes,
65                 (4) Percentages or fractional interests of parties to this agreement,
66                 (5) Oil and Gas Leases and/or Oil and Gas Interests subject to this agreement,
67                 (6) Burdens on production.
68  __X__   B.  Exhibit "B," Form of Lease.
69  _____   C.  Exhibit "C," Accounting Procedure.
70  _____   D.  Exhibit "D," Insurance.
71  _____   E.  Exhibit "E," Gas Balancing Agreement.
72  _____   F.  Exhibit "F," Non-Discrimination and Certification of Non-Segregated Facilities.
73  _____   G.  Exhibit "G," Tax Partnership.
74  _____   H.  Other: _____

                                            - 1 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1    If any provision of any exhibit, except Exhibits "E," "F" and "G," is inconsistent with any provision contained in
2  the body of this agreement, the provisions in the body of this agreement shall prevail.
3                                                  ARTICLE III.
4                                         INTERESTS OF PARTIES
5  A. Oil and Gas Interests:
6        If any party owns an Oil and Gas Interest in the Contract Area, that interest shall be treated for all purposes of this
7  agreement and during the term hereof as if it were covered by the form of Oil and Gas Lease attached hereto as Exhibit "B,"
8  and the owner thereof shall be deemed to own both royalty interest in such lease and the interest of the lessee thereunder.
9  B. Interests of Parties in Costs and Production:
10        Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne
11  and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their
12  interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the
13  Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter.
14        Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other
15  burdens may be payable and except as otherwise expressly provided in this agreement, each party shall pay or deliver, or
16  cause to be paid or delivered, all burdens on its share of the production from the Contract Area up to, but not in excess of,
17  _____20%_____ and shall indemnify, defend and hold the other parties free from any liability therefor.
18  Except as otherwise expressly provided in this agreement, if any party has contributed hereto any Lease or Interest which is
19  burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts
20  stipulated above, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend
21  and hold the other parties hereto harmless from any and all claims attributable to such excess burden. However, so long as
22  the Drilling Unit for the productive Zone(s) is identical with the Contract Area, each party shall pay or deliver, or cause to
23  be paid or delivered, all burdens on production from the Contract Area due under the terms of the Oil and Gas Lease(s)
24  which such party has contributed to this agreement, and shall indemnify, defend and hold the other parties free from any
25  liability therefor.
26        No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's
27  lessor or royalty owner, and if such other party's lessor or royalty owner should demand and receive settlement on a higher
28  price basis, the party contributing the affected Lease shall bear the additional royalty burden attributable to such higher price.
29        Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby,
30  and in the event two or more parties contribute to this agreement jointly owned Leases, the parties' undivided interests in
31  said Leaseholds shall be deemed separate leasehold interests for the purposes of this agreement.
32  C. Subsequently Created Interests:
33        If any party has contributed hereto a Lease or Interest that is burdened with an assignment of production given as security
34  for the payment of money, or if, after the date of this agreement, any party creates an overriding royalty, production
35  payment, net profits interest, assignment of production or other burden payable out of production attributable to its working
36  interest hereunder, such burden shall be deemed a "Subsequently Created Interest." Further, if any party has contributed
37  hereto a Lease or Interest burdened with an overriding royalty, production payment, net profits interest, or other burden
38  payable out of production created prior to the date of this agreement, and such burden is not shown on Exhibit "A," such
39  burden also shall be deemed a Subsequently Created Interest to the extent such burden causes the burdens on such party's
40  Lease or Interest to exceed the amount stipulated in Article III.B. above.
41        The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and
42  alone bear, pay and discharge the Subsequently Created Interest and shall indemnify, defend and hold harmless the other
43  parties from and against any liability therefor. Further, if the Burdened Party fails to pay, when due, its share of expenses
44  chargeable hereunder, all provisions of Article VII.B shall be enforceable against the Subsequently Created Interest in the
45  same manner as they are enforceable against the working interest of the Burdened Party. If the Burdened Party is required
46  under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the
47  production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of
48  said Subsequently Created Interest, and the Burdened Party shall indemnify, defend and hold harmless said other party, or
49  parties, from any and all claims and demands for payment asserted by owners of the Subsequently Created Interest.
50                                                 ARTICLE IV.
51                                                  TITLES
52  A. Title Examination:
53        Title examination shall be made on the Drillsite of any proposed well prior to commencement of drilling operations and,
54  if a majority in interest of the Drilling Parties so request or Operator so elects, title examination shall be made on the entire
55  Drilling Unit, or maximum anticipated Drilling Unit, of the well.   The opinion will include the ownership of the working
56  interest, minerals, royalty, overriding royalty and production payments under the applicable Leases.   Each party contributing
57  Leases and/or Oil and Gas Interests to be included in the Drillsite or Drilling Unit, if appropriate, shall furnish to Operator
58  all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of
59  charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the
60  examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or
61  by outside attorneys. Copies of all title opinions shall be furnished to each Drilling Party. Costs incurred by Operator in
62  procuring abstracts, fees paid outside attorneys for title examination (including preliminary, supplemental, shut-in royalty
63  opinions and division order title opinions) and other direct charges as provided in Exhibit "C" shall be borne by the Drilling
64  Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such
65  interests appear in Exhibit "A." Operator shall make no charge for services rendered by its staff attorneys or other personnel
66  in the performance of the above functions.
67        Each party Operator shall be responsible for securing curative matter and pooling amendments or agreements required in
68  connection with Leases or Oil and Gas Interests contributed by such party. Operator shall be responsible for the preparation
69  and recording of pooling designations or declarations and communitization agreements as well as the conduct of hearings
70  before governmental agencies for the securing of spacing or pooling orders or any other orders necessary or appropriate to
71  the conduct of operations hereunder. This shall not prevent any party from appearing on its own behalf at such hearings.
72  Costs incurred by Operator, including fees paid to outside attorneys, which are associated with hearings before governmental
73  agencies, and which costs are necessary and proper for the activities contemplated under this agreement, shall be direct
74  charges to the joint account and shall not be covered by the administrative overhead charges as provided in Exhibit "C."

-2-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

No well shall be drilled on the Contract Area until after (1) the title to the Drillsite or Drilling Unit, if appropriate, has been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the Drilling Parties in such well.

B. Loss or Failure of Title:

~~1. Failure of Title: Should any Oil and Gas Interest or Oil and Gas Lease be lost through failure of title, which results in a reduction of interest from that shown on Exhibit "A," the party credited with contributing the affected Lease or Interest (including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title failure to acquire a new Lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas Leases and Interests; and~~

~~(a) The party credited with contributing the Oil and Gas Lease or Interest affected by the title failure (including, if applicable, a successor in interest to such party) shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;~~

~~(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the Lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose Lease or Interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the Lease or Interest failed;~~

~~(c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Contract Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable to the Lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well attributable to such failed Lease or Interest;~~

~~(d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;~~

~~(e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises by reason of title failure shall be borne severally by each party (including a predecessor to a current party) who received production for which such accounting is required based on the amount of such production received, and each such party shall severally indemnify, defend and hold harmless all other parties hereto for any such liability to account;~~

~~(f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of the Lease or Interest claimed to have failed, but if the party contributing such Lease or Interest hereto elects to defend its title it shall bear all expenses in connection therewith; and~~

~~(g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an interest in the wellbore of any well or wells and the production therefrom, such party's absence of interest in the remainder of the Contract Area shall be considered a Failure of Title as to such remaining Contract Area unless that absence of interest is reflected on Exhibit "A."~~

~~2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well payment, minimum royalty or royalty payment, or other payment necessary to maintain all or a portion of an Oil and Gas Lease or Interest is not paid or is erroneously paid, and as a result a Lease or Interest terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required payment secures a new Lease or Interest covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties reflected on Exhibit "A" shall be revised on an acreage basis, effective as of the date of termination of the Lease or Interest involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the Lease or Interest which has terminated. If the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of Oil and Gas attributable to the lost Lease or Interest, calculated on an acreage basis, for the development and operating costs previously paid on account of such Lease or Interest, it shall be reimbursed for unrecovered actual costs previously paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:~~

~~(a) Proceeds of Oil and Gas produced prior to termination of the Lease or Interest, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, previously accrued to the credit of the lost Lease or Interest, on an acreage basis, up to the amount of unrecovered costs;~~

~~(b) Proceeds of Oil and Gas, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, up to the amount of unrecovered costs attributable to that portion of Oil and Gas thereafter produced and marketed (excluding production from any wells thereafter drilled), which, in the absence of such Lease or Interest termination, would be attributable to the lost Lease or Interest on an acreage basis and which as a result of such Lease or Interest termination is credited to other parties, the proceeds of said portion of the Oil and Gas to be contributed by the other parties in proportion to their respective interests reflected on Exhibit "A"; and~~

~~(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the Lease or Interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~

3. Other Losses: All losses of Leases or Interests committed to this agreement, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses and shall be borne by all parties in proportion to their interests shown on Exhibit "A." This shall include but not be limited to the loss of any Lease or Interest through judicial decree or foreclosure express or implied covenants have not been performed (other than performance which requires only the payment of money), and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended. There shall be no readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.

~~4. Curing Title: In the event of a Failure of Title under Article IV.B.1. or a loss of title under Article IV.B.2. above, any Lease or Interest acquired by any party hereto (other than the party whose interest has failed or was lost) during the ninety (90) day period provided by Article IV.B.1. and Article IV.B.2. above covering all or a portion of the interest that has failed or was lost shall be offered at cost to the party whose interest has failed or was lost, and the provisions of Article VIII.B. shall not apply to such acquisition.~~

-3-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

ARTICLE V.

OPERATOR

A. Designation and Responsibilities of Operator:

Southwestern Oil Company _____ shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. In its performance of services hereunder for the Non-Operators, Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance with the election procedures contained in this agreement. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third party. Operator shall conduct its activities under this agreement as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct.

B. Resignation or Removal of Operator and Selection of Successor:

1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.

Subject to Article VII.D.1., such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2. Selection of Successor Operator: Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.

3. Effect of Bankruptcy: If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a member of the operating committee, and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."

C. Employees and Contractors:

The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees or contractors shall be the employees or contractors of Operator.

D. Rights and Duties of Operator:

1. Competitive Rates and Use of Affiliates: All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. All work performed or materials supplied by affiliates or related parties of Operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in the industry.

2. Discharge of Joint Account Obligations: Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C." Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

3. Protection from Liens: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from

-4-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or materials supplied.

4. Custody of Funds: Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose other than to account for Non-Operator funds as herein specifically provided. Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the parties otherwise specifically agree.

5. Access to Contract Area and Records: Operator shall, except as otherwise provided herein, permit each Non-Operator or its duly authorized representative, at the Non-Operator's sole risk and cost, full and free access at all reasonable times to all operations of every kind and character being conducted for the joint account on the Contract Area and to the records of operations conducted thereon or production therefrom, including Operator's books and records relating thereto. Such access rights shall not be exercised in a manner interfering with Operator's conduct of an operation hereunder and shall not obligate Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such interpretive data was charged to the joint account. Operator will furnish to each Non-Operator upon request copies of any and all reports and information obtained by Operator in connection with production and related items, including, without limitation, notes and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding purchase contracts and pricing information to the extent not applicable to the production of the Non-Operator seeking the information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures shall be conducted in accordance with the audit protocol specified in Exhibit "C."

6. Filing and Furnishing Governmental Reports: Operator will file, and upon written request promptly furnish copies to each requesting Non-Operator not in default of its payment obligations, all operational notices, reports or applications required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder. Each Non-Operator shall provide to Operator on a timely basis all information necessary to Operator to make such filings.

7. Drilling and Testing Operations: The following provisions shall apply to each well drilled hereunder, including but not limited to the Initial Well:

(a) Operator will promptly advise Non-Operators of the date on which the well is spudded, or the date on which drilling operations are commenced.

(b) Operator will send to Non-Operators such reports, test results and notices regarding the progress of operations on the well as the Non-Operators shall reasonably request, including, but not limited to, daily drilling reports, completion reports, and well logs.

(c) Operator shall adequately test all Zones encountered which may reasonably be expected to be capable of producing Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted hereunder.

8. Cost Estimates: Upon request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement. Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith.

9. Insurance: At all times while operations are conducted hereunder, Operator shall comply with the workers compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C." Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

## ARTICLE VI.
## DRILLING AND DEVELOPMENT

A. Initial Well:

~~On or before the _____ day of _____, Operator shall commence the drilling of the Initial Well at the following location:~~

~~and shall thereafter continue the drilling of the well with due diligence to~~

~~The drilling of the Initial Well and the participation therein by all parties is obligatory, subject to Article VI.C.1. as to participation in Completion operations and Article VI.F. as to termination of operations and Article XI. as to occurrence of force majeure.~~

B. Subsequent Operations:

1. Proposed Operations: If any party hereto should desire to drill any well on the Contract Area other than the Initial Well, or if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of producing in paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1 under this agreement and to all other parties in the case of a proposal for Sidetracking or Deepening, specifying the work to be
2 performed, the location, proposed depth, objective Zone and the estimated cost of the operation. The parties to whom such a
3 notice is delivered shall have thirty (30) days after receipt of the notice within which to notify the party proposing to do the work
4 whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to
5 Rework, Sidetrack, Recomplete, Plug Back or Deepen may be given by telephone and the response period shall be limited to forty-
6 eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party to whom such notice is delivered to reply
7 within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.
8 Any proposal by a party to conduct an operation conflicting with the operation initially proposed shall be delivered to all parties
9 within the time and in the manner provided in Article VI.B.6.

10 If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be
11 contractually committed to participate therein provided such operations are commenced within the time period hereafter set
12 forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as
13 promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case
14 may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of
15 the parties participating therein; provided, however, said commencement date may be extended upon written notice of same
16 by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such
17 additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-
18 way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or
19 acceptance. If the actual operation has not been commenced within the time provided (including any extension thereof as
20 specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct
21 said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior
22 proposal had been made. Those parties that did not participate in the drilling of a well for which a proposal to Deepen or
23 Sidetrack is made hereunder shall, if such parties desire to participate in the proposed Deepening or Sidetracking operation,
24 reimburse the Drilling Parties in accordance with Article VI.B.4. in the event of a Deepening operation and in accordance
25 with Article VI.B.5. in the event of a Sidetracking operation

26     2. Operations by Less Than All Parties:
27 (a) Determination of Participation. If any party to whom such notice is delivered as provided in Article VI.B.1. or
28 VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this
29 Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no
30 later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the
31 expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the
32 proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting
33 Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party,
34 the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the
35 account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The
36 rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party
37 designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when
38 conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this
39 agreement

40 If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the
41 applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its
42 recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party,
43 within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the
44 proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its
45 proportionate part (determined by dividing such party's interest in the Contract Area by the interests of all Consenting Parties in
46 the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of
47 Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties'
48 interests that any Consenting Party did not elect to take. Any interest of Non-Consenting Parties that is not carried by a
49 Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its
50 proposal. Failure to advise the proposing party within the time required shall be deemed an election under (i). In the event a
51 drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a
52 total of forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may
53 withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10)
54 days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period.
55 If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties
56 of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the
57 period provided in Article VI.B.1., subject to the same extension right as provided therein.

58 (b) Relinquishment of Interest for Non-Participation. The entire cost and risk of conducting such operations shall be
59 borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding
60 paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and
61 encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results
62 in a dry hole, then subject to Articles VI.B.6. and VI.E.3., the Consenting Parties shall plug and abandon the well and restore
63 the surface location at their sole cost, risk and expense; provided, however, that those Non-Consenting Parties that
64 participated in the drilling, Deepening or Sidetracking of the well shall remain liable for, and shall pay, their proportionate
65 shares of the cost of plugging and abandoning the well and restoring the surface location insofar only as those costs were not
66 increased by the subsequent operations of the Consenting Parties. If any well drilled, Reworked, Sidetracked, Deepened,
67 Recompleted or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in
68 paying quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, and the
69 well shall then be turned over to Operator (if the Operator did not conduct the operation) and shall be operated by it at the
70 expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, Reworking,
71 Sidetracking, Recompleting, Deepening or Plugging Back of any such well by Consenting Parties in accordance with the
72 provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the
73 Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-
74 Consenting Party's interest in the well and share of production therefrom or, in the case of a Reworking, Sidetracking,

-6-

Deepening, Recompleting or Plugging Back, or a Completion pursuant to Article VI.C.1. Option No. 2, all of such Non-Consenting Party's interest in the production obtained from the operation in which the Non-Consenting Party did not elect to participate. Such relinquishment shall be effective until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold (after deducting applicable ad valorem, production, severance, and excise taxes, royalty, overriding royalty and other interests not excepted by Article III.C. payable out of or measured by the production from such well accruing with respect to such interest until it reverts), shall equal the total of the following:

(i) __380__ % of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including but not limited to stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning of the operation; and

(ii) __300__ % of (a) that portion of the costs and expenses of drilling, Reworking, Sidetracking, Deepening, Plugging Back, testing, Completing, and Recompleting, after deducting any cash contributions received under Article VIII.C., and of (b) that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

Notwithstanding anything to the contrary in this Article VI.B., if the well does not reach the deepest objective Zone described in the notice proposing the well for reasons other than the encountering of granite or practically impenetrable substance or other condition in the hole rendering further operations impracticable, Operator shall give notice thereof to each Non-Consenting Party who submitted or voted for an alternative proposal under Article VI.B.6. to drill the well to a shallower Zone than the deepest objective Zone proposed in the notice under which the well was drilled, and each such Non-Consenting Party shall have the option to participate in the initial proposed Completion of the well by paying its share of the cost of drilling the well to its actual depth, calculated in the manner provided in Article VI.B.4. (a). If any such Non-Consenting Party does not elect to participate in the first Completion proposed for such well, the relinquishment provisions of this Article VI.B.2. (b) shall apply to such party's interest.

(c) Reworking, Recompleting or Plugging Back. An election not to participate in the drilling, Sidetracking or Deepening of a well shall be deemed an election not to participate in any Reworking or Plugging Back operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Similarly, an election not to participate in the Completing or Recompleting of a well shall be deemed an election not to participate in any Reworking operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Any such Reworking, Recompleting or Plugging Back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties _____% of that portion of the costs of the Reworking, Recompleting or Plugging Back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If such a Reworking, Recompleting or Plugging Back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.

(d) Recoupment Matters. During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all ad valorem, production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.C.

In the case of any Reworking, Sidetracking, Plugging Back, Recompleting or Deepening operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such Reworking, Sidetracking, Plugging Back, Recompleting or Deepening, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within ninety (90) days after the completion of any operation under this Article, the party conducting the operation for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, Sidetracking, Deepening, Plugging Back, testing, Completing, Recompleting, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of Oil and Gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. In determining the quantity of Oil and Gas produced during any month, Consenting Parties shall use industry accepted methods such as but not limited to metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it as of 7:00 a.m. on the day following the day on which such recoupment occurs, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, Sidetracking, Reworking, Deepening, Recompleting or Plugging Back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and Exhibit "C" attached hereto.

3. Stand-By Costs: When a well which has been drilled or Deepened has reached its authorized depth and all tests have been completed and the results thereof furnished to the' parties, or when operations on the well have been otherwise terminated pursuant to Article VI.F., stand-by costs incurred pending response to a party's notice proposing a Reworking,

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1  Sidetracking, Deepening, Recompleting, Plugging Back or Completing operation in such a well (including the period required
2  under Article VI.B.6 to resolve competing proposals) shall be charged and borne as part of the drilling or Deepening
3  operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted,
4  whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms
5  of the second grammatical paragraph of Article VI.B.2. (a), shall be charged to and borne as part of the proposed operation,
6  but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated
7  between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total
8  interest as shown on Exhibit "A" of all Consenting Parties.

9  In the event that notice for a Sidetracking operation is given while the drilling rig to be utilized is on location, any party
10  may request and receive up to five (5) additional days after expiration of the forty-eight hour response period specified in
11  Article VI.B.1. within which to respond by paying for all stand-by costs and other costs incurred during such extended
12  response period; Operator may require such party to pay the estimated stand-by time in advance as a condition to extending
13  the response period. If more than one party elects to take such additional time to respond to the notice, standby costs shall be
14  allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's
15  interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.

16  4. Deepening: If less than all parties elect to participate in a drilling, Sidetracking, or Deepening operation proposed
17  pursuant to Article VI.B.1., the interest relinquished by the Non-Consenting Parties to the Consenting Parties under Article
18  VI.B.2. shall relate only and be limited to the lesser of (i) the total depth actually drilled or (ii) the objective depth or Zone
19  of which the parties were given notice under Article VI.B.1. ("Initial Objective"). Such well shall not be Deepened beyond the
20  Initial Objective without first complying with this Article to afford the Non-Consenting Parties the opportunity to participate
21  in the Deepening operation.

22  In the event any Consenting Party desires to drill or Deepen a Non-Consent Well to a depth below the Initial Objective,
23  such party shall give notice thereof, complying with the requirements of Article VI.B.1., to all parties (including Non-
24  Consenting Parties). Thereupon, Articles VI.B.1. and 2. shall apply and all parties receiving such notice shall have the right to
25  participate or not participate in the Deepening of such well pursuant to said Articles VI.B.1. and 2. If a Deepening operation
26  is approved pursuant to such provisions, and if any Non-Consenting Party elects to participate in the Deepening operation,
27  such Non-Consenting party shall pay or make reimbursement (as the case may be) of the following costs and expenses.

28  (a) If the proposal to Deepen is made prior to the Completion of such well as a well capable of producing in paying
29  quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) that share of costs
30  and expenses incurred in connection with the drilling of said well from the surface to the Initial Objective which Non-
31  Consenting Party would have paid had such Non-Consenting Party agreed to participate therein, plus the Non-Consenting
32  Party's share of the cost of Deepening and of participating in any further operations on the well in accordance with the other
33  provisions of this Agreement; provided, however, all costs for testing and Completion or attempted Completion of the well
34  incurred by Consenting Parties prior to the point of actual operations to Deepen beyond the Initial Objective shall be for the
35  sole account of Consenting Parties.

36  (b) If the proposal is made for a Non-Consent Well that has been previously Completed as a well capable of producing
37  in paying quantities, but is no longer capable of producing in paying quantities, such Non-Consenting Party shall pay (or
38  reimburse Consenting Parties for, as the case may be) its proportionate share of all costs of drilling, Completing, and
39  equipping said well from the surface to the Initial Objective, calculated in the manner provided in paragraph (a) above, less
40  those costs recouped by the Consenting Parties from the sale of production from the well. The Non-Consenting Party shall
41  also pay its proportionate share of all costs of re-entering said well. The Non-Consenting Parties' proportionate part (based
42  on the percentage of such well Non-Consenting Party would have owned had it previously participated in such Non-Consent
43  Well) of the costs of salvable materials and equipment remaining in the hole and salvable surface equipment used in
44  connection with such well shall be determined in accordance with Exhibit "C." If the Consenting Parties have recouped the
45  cost of drilling, Completing, and equipping the well at the time such Deepening operation is conducted, then a Non-
46  Consenting Party may participate in the Deepening of the well with no payment for costs incurred prior to re-entering the
47  well for Deepening.

48  The foregoing shall not imply a right of any Consenting Party to propose any Deepening for a Non-Consent Well prior
49  to the drilling of such well to its Initial Objective without the consent of the other Consenting Parties as provided in Article
50  VI.F.

51  5. Sidetracking: Any party having the right to participate in a proposed Sidetracking operation that does not own an
52  interest in the affected wellbore at the time of the notice shall, upon electing to participate, tender to the wellbore owners its
53  proportionate share (equal to its interest in the Sidetracking operation) of the value of that portion of the existing wellbore
54  to be utilized as follows:

55  (a) If the proposal is for Sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs
56  incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is initiated.

57  (b) If the proposal is for Sidetracking a well which has previously produced, reimbursement shall be on the basis of
58  such party's proportionate share of drilling and equipping costs incurred in the initial drilling of the well down to the depth
59  at which the Sidetracking operation is conducted, calculated in the manner described in Article VI.B.4(b) above. Such party's
60  proportionate share of the cost of the wells, salvable materials and equipment down to the depth at which the Sidetracking
61  operation is initiated shall be determined in accordance with the provisions of Exhibit "C."

62  6. Order of Preference of Operations. Except as otherwise specifically provided in this agreement, if any party desires to
63  propose the conduct of an operation that conflicts with a proposal that has been made by a party under this Article VI, such
64  party shall have fifteen (15) days from delivery of the initial proposal, in the case of a proposal to drill a well or to perform
65  an operation on a well where no drilling rig is on location, or twenty-four (24) hours, exclusive of Saturday, Sunday and legal
66  holidays, from delivery of the initial proposal, if a drilling rig is on location for the well on which such operation is to be
67  conducted, to deliver to all parties entitled to participate in the proposed operation such party's alternative proposal, such
68  alternate proposal to contain the same information required to be included in the initial proposal. Each party receiving such
69  proposals shall elect by delivery of notice to Operator within five (5) days after expiration of the proposal period, or within
70  twenty-four (24) hours (exclusive of Saturday, Sunday and legal holidays) if a drilling rig is on location for the well that is the
71  subject of the proposals, to participate in one of the competing proposals. Any party not electing within the time required
72  shall be deemed not to have voted. The proposal receiving the vote of parties owning the largest aggregate percentage
73  interest of the parties voting shall have priority over all other competing proposals; in the case of a tie vote, the
74

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1  initial proposal shall prevail. Operator shall deliver notice of such result to all parties entitled to participate in the operation
2  within five (5) days after expiration of the election period (or within twenty-four (24) hours, exclusive of Saturday, Sunday
3  and legal holidays, if a drilling rig is on location). Each party shall then have two (2) days (or twenty-four (24) hours if a rig
4  is on location) from receipt of such notice to elect by delivery of notice to Operator to participate in such operation or to
5  relinquish interest in the affected well pursuant to the provisions of Article VI.B.2.; failure by a party to deliver notice within
6  such period shall be deemed an election not to participate in the prevailing proposal.

7      7. Conformity to Spacing Pattern. Notwithstanding the provisions of this Article VI.B.2., it is agreed that no wells shall be
8  proposed to be drilled to or Completed in or produced from a Zone from which a well located elsewhere on the Contract
9  Area is producing, unless such well conforms to the then-existing well spacing pattern for such Zone.

10      8. Paying Wells. No party shall conduct any Reworking, Deepening, Plugging Back, Completion, Recompletion, or
11  Sidetracking operation under this agreement with respect to any well then capable of producing in paying quantities except
12  with the consent of all parties that have not relinquished interest in the well at the time of such operation.

13  C.  Completion of Wells; Reworking and Plugging Back:

14      1. Completion: Without the consent of all parties, no well shall be drilled, Deepened or Sidetracked, except any well
15  drilled, Deepened or Sidetracked pursuant to the provisions of Article VI.B.2. of this agreement.  Consent to the drilling,
16  Deepening or Sidetracking shall include:

17      ☐  Option No. 1: All necessary expenditures for the drilling, Deepening or Sidetracking, testing, Completing and
18          equipping of the well, including necessary tankage and/or surface facilities.

19      ☒  Option No. 2: All necessary expenditures for the drilling, Deepening or Sidetracking and testing of the well. When
20  such well has reached its authorized depth, and all logs, cores and other tests have been completed, and the results
21  thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators having the right to
22  participate in a Completion attempt whether or not Operator recommends attempting to Complete the well,
23  together with Operator's AFE for Completion costs if not previously provided.  The parties receiving such notice
24  shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect by delivery of
25  notice to Operator to participate in a recommended Completion attempt or to make a Completion proposal with an
26  accompanying AFE.  Operator shall deliver any such Completion proposal, or any Completion proposal conflicting
27  with Operator's proposal, to the other parties entitled to participate in such Completion in accordance with the
28  procedures specified in Article VI.B.6.  Election to participate in a Completion attempt shall include consent to all
29  necessary expenditures for the Completing and equipping of such well, including necessary tankage and/or surface
30  facilities but excluding any stimulation operation not contained on the Completion AFE.  Failure of any party
31  receiving such notice to reply within the period above fixed shall constitute an election by that party not to
32  participate in the cost of the Completion attempt; provided, that Article VI.B.6. shall control in the case of
33  conflicting Completion proposals.  If one or more, but less than all of the parties, elect to attempt a Completion, the
34  provision of Article VI.B.2. hereof (the phrase "Reworking, Sidetracking, Deepening, Recompleting or Plugging
35  Back" as contained in Article VI.B.2. shall be deemed to include "Completing") shall apply to the operations
36  thereafter conducted by less than all parties; provided, however, that Article VI.B.2. shall apply separately to each
37  separate Completion or Recompletion attempt undertaken hereunder, and an election to become a Non-Consenting
38  Party as to one Completion or Recompletion attempt shall not prevent a party from becoming a Consenting Party
39  in subsequent Completion or Recompletion attempts regardless whether the Consenting Parties as to earlier
40  Completions or Recompletion have recouped their costs pursuant to Article VI.B.2.; provided further, that any
41  recoupment of costs by a Consenting Party shall be made solely from the production attributable to the Zone in
42  which the Completion attempt is made.  Election by a previous Non-Consenting party to participate in a subsequent
43  Completion or Recompletion attempt shall require such party to pay its proportionate share of the cost of salvable
44  materials and equipment installed in the well pursuant to the previous Completion or Recompletion attempt,
45  insofar and only insofar as such materials and equipment benefit the Zone in which such party participates in a
46  Completion attempt.

47      2. Rework, Recomplete or Plug Back: No well shall be Reworked, Recompleted or Plugged Back except a well Reworked,
48  Recompleted, or Plugged Back pursuant to the provisions of Article VI.B.2. of this agreement.  Consent to the Reworking,
49  Recompleting or Plugging Back of a well shall include all necessary expenditures in conducting such operations and
50  Completing and equipping of said well, including necessary tankage and/or surface facilities.

51  D.  Other Operations:

52      Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of _____
53  _____ Twenty Five Thousand _____ Dollars ($ 25,000.00 _____) except in connection with the
54  drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting or Plugging Back of a well that has been previously
55  authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
56  emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion
57  are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the
58  emergency to the other parties.  If Operator prepares an AFE for its own use, Operator shall furnish any Non-Operator so
59  requesting an information copy thereof for any single project costing in excess of __25,000.00 _____ Dollars
60  ($ 25,000.00 _____).  Any party who has not relinquished its interest in a well shall have the right to propose that
61  Operator perform repair work or undertake the installation of artificial lift equipment or ancillary production facilities such as
62  salt water disposal wells or to conduct additional work with respect to a well drilled hereunder or other similar project (but
63  not including the installation of gathering lines or other transportation or marketing facilities, the installation of which shall
64  be governed by separate agreement between the parties) reasonably estimated to require an expenditure in excess of the
65  amount first set forth above in this Article VI.D. (except in connection with an operation required to be proposed under
66  Articles VI.B.1. or VI.C.1. Option No. 2, which shall be governed exclusively by these Articles).  Operator shall deliver such
67  proposal to all parties entitled to participate therein.  If within thirty (30) days thereof Operator secures the written consent
68  of any party or parties owning at least _____51 _____% of the interests of the parties entitled to participate in such operation,
69  each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated
70  to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms
71  of the proposal.

72  E.  Abandonment of Wells:

73      1. Abandonment of Dry Holes: Except for any well drilled or Deepened pursuant to Article VI.B.2., any well which has
74  been drilled or Deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be

- 9 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1   plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any
2   party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after
3   delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the
4   proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the
5   cost, risk and expense of the parties who participated in the cost of drilling or Deepening such well. Any party who objects to
6   plugging and abandoning such well by notice delivered to Operator within forty-eight (48) hours (exclusive of Saturday,
7   Sunday and legal holidays) after delivery of notice of the proposed plugging shall take over the well as of the end of such
8   forty-eight (48) hour notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of
9   Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct
10  such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and
11  abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well. The party
12  taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against
13  liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and
14  restoring the surface, for which the abandoning parties shall remain proportionately liable.

15      2. Abandonment of Wells That Have Produced: Except for any well in which a Non-Consent operation has been
16  conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has
17  been completed as a producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to
18  such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk
19  and expense of all the parties hereto. Failure of a party to reply within sixty (60) days of delivery of notice of proposed
20  abandonment shall be deemed an election to consent to the proposal. If, within sixty (60) days after delivery of notice of the
21  proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its
22  operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the
23  applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties
24  against liability for any further operations on the well conducted by such parties. Failure of such party or parties to provide
25  proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well
26  within the required period or thereafter to conduct operations on such well shall entitle operator to retain or take possession
27  of such well and plug and abandon the well.

28      Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of
29  the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost
30  of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event
31  the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the
32  value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing
33  operations their proportionate shares of the estimated excess cost. Each abandoning party shall assign to the non-abandoning
34  parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all
35  of its interest in the wellbore of the well and related equipment, together with its interest in the Leasehold insofar and only
36  insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production. If the
37  interest of the abandoning party is or includes an Oil and Gas interest, such party shall execute and deliver to the non-
38  abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of
39  one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form
40  attached as Exhibit "B." The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located.
41  The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their
42  respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract
43  Area of all assignees. There shall be no readjustment of interests in the remaining portions of the Contract Area.

44      Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production
45  from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. Upon
46  request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and
47  charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate
48  ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor
49  shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in
50  further operations therein subject to the provisions hereof.

51      3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as
52  between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided,
53  however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further
54  operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well
55  in accordance with the provisions of this Article VI.E.; and provided further, that Non-Consenting Parties who own an interest
56  in a portion of the well shall pay their proportionate shares of abandonment and surface restoration cost for such well as
57  provided in Article VI.B.2.(b).

58  F. Termination of Operations:

59      Upon the commencement of an operation for the drilling, Reworking, Sidetracking, Plugging Back, Deepening, testing,
60  Completion or plugging of a well, including but not limited to the Initial Well, such operation shall not be terminated without
61  consent of parties bearing __5)__ % of the costs of such operation; provided, however, that in the event granite or other
62  practically impenetrable substance or condition in the hole is encountered which renders further operations impractical,
63  Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.B.1., and the
64  provisions of Article VI.B. or VI.E. shall thereafter apply to such operation, as appropriate.

65  G. Taking Production in Kind:

66  ☐ Option No. 1: Gas Balancing Agreement Attached
67      Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the
68  Contract Area, exclusive of production which may be used in development and producing operations and in preparing and
69  treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking
70  in-kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any
71  party taking its share of production in kind shall be required to pay for only its proportionate share of such part of
72  Operator's surface facilities which it uses.
73      Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in
74  production from the Contract Area, and, except as provided in Article VI.B., shall be entitled to receive payment

- 10 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

~~directly from the purchaser thereof for its share of all production.~~

~~If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it but not the obligation, to purchase such Oil or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise at any time its right to take in kind or separately dispose of, its share of all Oil not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of Oil shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.~~

~~Any such sale by Operator shall be in a manner commercially reasonable under the circumstances but Operator shall have no duty to share any existing market or to obtain a price equal to that received under any existing market. The sale or delivery by Operator of a non-taking party's share of Oil under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase shall be made by Operator without first giving the non-taking party at least ten (10) days written notice of such intended purchase and the price to be paid or the pricing basis to be used.~~

~~All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.~~

~~In the event one or more parties' separate disposition of its share of the Gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day to day basis for any reason are not exactly equal to a party's respective proportionate share of total Gas sales to be allocated to it, the balancing or accounting between the parties shall be in accordance with any Gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E" or is a separate agreement. Operator shall give notice to all parties of the first sales of Gas from any well under this agreement.~~

☒ Option No. 2: No Gas Balancing Agreement:

Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditures incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.

If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil and/or Gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil and/or Gas or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise its right to take in kind, or separately dispose of, its share of all Oil and/or Gas not previously delivered to a purchaser; provided, however, that the effective date of any such revocation may be deferred at Operator's election for a period not to exceed ninety (90) days if Operator has committed such production to a purchase contract having a term extending beyond such ten (10)-day period. Any purchase or sale by Operator of any other party's share of Oil and/or Gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

Any such sale by Operator shall be in a manner commercially reasonable under the circumstances, but Operator shall have no duty to share any existing market or transportation arrangement or to obtain a price or transportation fee equal to that received under any existing market or transportation arrangement. The sale or delivery by Operator of a non-taking party's share of production under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase of Oil and Gas and no sale of Gas shall be made by Operator without first giving the non-taking party ten days written notice of such intended purchase or sale and the price to be paid or the pricing basis to be used. Operator shall give notice to all parties of the first sale of Gas from any well under this Agreement.

All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.

ARTICLE VII.
EXPENDITURES AND LIABILITY OF PARTIES

A. Liability of Parties:

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally, and no party shall have any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder.

-11-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

B. Liens and Security Interests:

Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing. .

To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge the recording supplement and/or any financing statement prepared and submitted by any party hereto in conjunction herewith or at any time following execution hereof, and Operator is authorized to file this agreement or the recording supplement executed herewith as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate to perfect the security interest granted hereunder. Any party may file this agreement, the recording supplement executed herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and/or a financing statement with the proper officer under the Uniform Commercial Code.

Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interests or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest as provided in "Exhibit C" has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

If any party fails to pay its share of cost within one hundred twenty (120) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in Article VII.B., and each paying party may independently pursue any remedy available hereunder or otherwise.

If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale. any available right to stay execution or to require a marshaling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.

C. Advances:

Operator, at its election, shall have the right from time to time to demand and receive from one or more of the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

D. Defaults and Remedies:

If any party fails to discharge any financial obligation under this agreement, including without limitation the failure to make any advance under the preceding Article VII.C. or any other provision of this agreement, within the period required for such payment hereunder, then in addition to the remedies provided in Article VII.B. or elsewhere in this agreement, the remedies specified below shall be applicable. For purposes of this Article VII.D., all notices and elections shall be delivered

- 12 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

only by Operator, except that Operator shall deliver any such notice and election requested by a non-defaulting Non-Operator, and when Operator is the party in default, the applicable notices and elections can be delivered by any Non-Operator. Election of any one or more of the following remedies shall not preclude the subsequent use of any other remedy specified below or otherwise available to a non-defaulting party.

1. Suspension of Rights: Any party may deliver to the party in default a Notice of Default, which shall specify the default, specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one or more of the remedies provided in this Article. If the default is not cured within thirty (30) days of the delivery of such Notice of Default, all of the rights of the defaulting party granted by this agreement may upon notice be suspended until the default is cured, without prejudice to the right of the non-defaulting party or parties to continue to enforce the obligations of the defaulting party previously accrued or thereafter accruing under this agreement. If Operator is the party in default, the Non-Operators shall have in addition the right, by vote of Non-Operators owning a majority in interest in the Contract Area after excluding the voting interest of Operator, to appoint a new Operator effective immediately. The rights of a defaulting party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right to receive information as to any operation conducted hereunder during the period of such default, the right to elect to participate in an operation proposed under Article VI.B. of this agreement, the right to participate in an operation being conducted under this agreement even if the party has previously elected to participate in such operation, and the right to receive proceeds of production from any well subject to this agreement.

2. Suit for Damages: Non-defaulting parties or Operator for the benefit of non-defaulting parties may sue (at joint account expense) to collect the amounts in default, plus interest accruing on the amounts recovered from the date of default until the date of collection at the rate specified in Exhibit "C" attached hereto. Nothing herein shall prevent any party from suing any defaulting party to collect consequential damages accruing to such party as a result of the default.

3. Deemed Non-Consent: The non-defaulting party may deliver a written Notice of Non-Consent Election to the defaulting party at any time after the expiration of the thirty-day cure period following delivery of the Notice of Default, in which event if the billing is for the drilling a new well or the Plugging Back, Sidetracking, Reworking or Deepening of a well which is to be or has been plugged as a dry hole, or for the Completion or Recompletion of any well, the defaulting party will be conclusively deemed to have elected not to participate in the operation and to be a Non-Consenting Party with respect thereto under Article VI.B. or VI.C., as the case may be, to the extent of the costs unpaid by such party, notwithstanding any election to participate theretofore made. If election is made to proceed under this provision, then the non-defaulting parties may not elect to sue for the unpaid amount pursuant to Article VII.D.2.

Until the delivery of such Notice of Non-Consent Election to the defaulting party, such party shall have the right to cure its default by paying its unpaid share of costs plus interest at the rate set forth in Exhibit "C," provided, however, such payment shall not prejudice the rights of the non-defaulting parties to pursue remedies for damages incurred by the non-defaulting parties as a result of the default. Any interest relinquished pursuant to this Article VII.D.3. shall be offered to the non-defaulting parties in proportion to their interests, and the non-defaulting parties electing to participate in the ownership of such interest shall be required to contribute their shares of the defaulted amount upon their election to participate therein.

4. Advance Payment: If a default is not cured within thirty (30) days of the delivery of a Notice of Default, Operator, or Non-Operators if Operator is the defaulting party, may thereafter require advance payment from the defaulting party of such defaulting party's anticipated share of any item of expense for which Operator, or Non-Operators, as the case may be, would be entitled to reimbursement under any provision of this agreement, whether or not such expense was the subject of the previous default. Such right includes, but is not limited to, the right to require advance payment for the estimated costs of drilling a well or Completion of a well as to which an election to participate in drilling or Completion has been made. If the defaulting party fails to pay the required advance payment, the non-defaulting parties may pursue any of the remedies provided in the Article VII.D. or any other default remedy provided elsewhere in this agreement. Any excess of funds advanced remaining when the operation is completed and all costs have been paid shall be promptly returned to the advancing party.

5. Costs and Attorneys' Fees: In the event any party is required to bring legal proceedings to enforce any financial obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure.

E. Rentals, Shut-in Well Payments and Minimum Royalties:

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the Operator and billed proportionately to the Parties Interests ~~party-or-parties-who-subjected-such-lease-to-this-agreement-at-its-or~~ ~~their~~ ~~expense.~~ ~~Prior~~ ~~to~~ ~~due~~ ~~date~~ ~~each~~ ~~party~~ ~~who~~ ~~or~~ ~~more~~ ~~parties~~ ~~own-and-have-contributed-interests-in-the-same-lease-to-this-agreement,-such-parties-may-designate-one-of-such-parties-to~~ ~~make-said-payments-for-and-on-behalf-of-all-such-parties.~~ Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

Operator shall notify Non-Operators of the anticipated completion of a shut-in well, or the shutting in or return to production of a producing well, at least five (5) days (excluding Saturday, Sunday, and legal holidays) prior to taking such action, or at the earliest opportunity permitted by circumstances, but assumes no liability for failure to do so. In the event of failure by Operator to so notify Non-Operators, the loss of any lease contributed hereto by Non-Operators for failure to make timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

F. Taxes:

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on Leases and Oil and Gas Interests contributed by such Non-Operator. If the assessed valuation of any Lease is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such Lease, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in the manner provided in Exhibit "C."

- 13 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1    If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
2  prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final
3  determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes
4  and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for
5  the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be
6  paid by them, as provided in Exhibit "C."
7    Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect
8  to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.

9                                         ARTICLE VIII.
10                        ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST

11  A. Surrender of Leases:
12    The Leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
13  or in part unless all parties consent thereto.
14    However, should any party desire to surrender its interest in any Lease or in any portion thereof, such party shall give written
15  notice of the proposed surrender to all parties, and the parties to whom such notice is delivered shall have thirty (30) days after
16  delivery of the notice within which to notify the party proposing the surrender whether they elect to consent thereto. Failure of a
17  party to whom such notice is delivered to reply within said 30-day period shall constitute a consent to the surrender of the Leases
18  described in the notice. If all parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or
19  implied warranty of title, all of its interest in such Lease, or portion thereof, and any well, material and equipment which may be
20  located thereon and any rights to production thereafter secured, to the parties not consenting to such surrender. If the interest of the
21  assigning party is or includes an Oil and Gas Interest, the assigning party shall execute and deliver to the party or parties not
22  consenting to such surrender an oil and gas lease covering such Oil and Gas Interest for a term of one (1) year and so long
23  thereafter as Oil and/or Gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B."
24  Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore
25  accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party
26  shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained
27  in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the
28  reasonable salvage value of the latter's interest in any well's salvable materials and equipment attributable to the assigned or leased
29  acreage. The value of all salvable materials and equipment shall be determined in accordance with the provisions of Exhibit "C," less
30  the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface. If such value is less
31  than such costs, then the party assignor or lessor shall pay to the party assignee or lessee the amount of such deficit. If the
32  assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the
33  interest of each bears to the total interest of all such parties. If the interest of the parties to whom the assignment is to be made
34  varies according to depth, then the interest assigned shall similarly reflect such variances.
35    Any assignment, lease or surrender made under this provision shall not enlarge or change the assignor's, lessor's or surrendering
36  party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
37  assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
38  agreement but shall be deemed subject to an Operating Agreement in the form of this agreement.

39  B. Renewal or Extension of Leases:
40    If any party secures a renewal or replacement of an Oil and Gas Lease or Interest subject to this agreement, then all other parties
41  shall be notified promptly upon such acquisition or, in the case of a replacement Lease taken before expiration of an existing Lease,
42  promptly upon expiration of the existing Lease. The parties notified shall have the right for a period of thirty (30) days following
43  delivery of such notice in which to elect to participate in the ownership of the renewal or replacement Lease, insofar as such Lease
44  affects lands within the Contract Area, by paying to the party who acquired it their proportionate shares of the acquisition cost
45  allocated to that part of such Lease within the Contract Area, which shall be in proportion to the interest held at that time by the
46  parties in the Contract Area. Each party who participates in the purchase of a renewal or replacement Lease shall be given an
47  assignment of its proportionate interest therein by the acquiring party.
48    If some, but less than all, of the parties elect to participate in the purchase of a renewal or replacement Lease, it shall be owned
49  by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in
50  the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the
51  purchase of such renewal or replacement Lease. The acquisition of a renewal or replacement Lease by any or all of the parties hereto
52  shall not cause a readjustment of the interests of the parties stated in Exhibit "A," but any renewal or replacement Lease in which
53  less than all parties elect to participate shall not be subject to this agreement but shall be deemed subject to a separate Operating
54  Agreement in the form of this agreement.
55    If the interests of the parties in the Contract Area vary according to depth, then their right to participate proportionately in
56  renewal or replacement Leases and their right to receive an assignment of interest shall also reflect such depth variances.
57    The provisions of this Article shall apply to renewal or replacement Leases whether they are for the entire interest covered by
58  the expiring Lease or cover only a portion of its area or an interest therein. Any renewal or replacement Lease taken before the
59  expiration of its predecessor Lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the
60  existing Lease, shall be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time
61  the renewal or replacement Lease becomes effective; but any Lease taken or contracted for more than six (6) months after the
62  expiration of an existing Lease shall not be deemed a renewal or replacement Lease and shall not be subject to the provisions of this
63  agreement.
64    The provisions in this Article shall also be applicable to extensions of Oil and Gas Leases.

65  C. Acreage or Cash Contributions:
66    While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other
67  operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall
68  be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom
69  the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the
70  proportions said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the
71  extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any
72  acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above
73  provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of well drilled
74  inside Contract Area.

-14-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

D. Assignment; Maintenance of Uniform Interest:

For the purpose of maintaining uniformity of ownership in the Contract Area in the Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production covered by this agreement no party shall sell, encumber, transfer or make other disposition of its interest in the Oil and Gas Leases and Oil and Gas Interests embraced within the Contract Area or in wells, equipment and production unless such disposition covers either:

1. the entire interest of the party in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production; or

2. an equal undivided percent of the party's present interest in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production in the Contract Area.

Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and Gas Lease or Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted hereunder in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. shall continue to burden the interest transferred to secure payment of any such obligations.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the Oil and Gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

E. Waiver of Rights to Partition:

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

F. Preferential Right to Purchase:

H. (Optional: Check if applicable.)

Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed disposition, which shall include the name and address of the prospective transferee (who must be ready, willing and able to purchase), the purchase price, a legal description sufficient to identify the property, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after the notice is delivered, to purchase for the stated consideration on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to transfer title to its interest to its mortgagee in lieu of or pursuant to foreclosure of a mortgage of its interest, or to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its Oil and Gas assets to any party, or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which such party owns a majority of the stock.

ARTICLE IX.
INTERNAL REVENUE CODE ELECTION

If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, and if the parties have not otherwise agreed to form a tax partnership pursuant to Exhibit "G" or other agreement between them, each party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K," Chapter 1, Subtitle "A," of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Treasury Regulation §1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K," Chapter 1, Subtitle "A," of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income.

ARTICLE X.
CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed _____ Twenty-Five Thousand _____ Dollars ($ 25,000.00 _____ ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## ARTICLE XI.
### FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

## ARTICLE XII.
### NOTICES

All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically provided, shall be in writing and delivered in person or by United States mail, courier service, telegram, telex, telecopier or any other form of facsimile, postage or charges prepaid, and addressed to such parties at the addresses listed on Exhibit "A." All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, or to the telecopy, facsimile or telex machine of such party. The second or any responsive notice shall be deemed delivered when deposited in the United States mail or at the office of the courier or telegraph service, or upon transmittal by telex, telecopy or facsimile, or when personally delivered to the party to be notified, provided, that when response is required within 24 or 48 hours, such response shall be given orally or by telephone, telex, telecopy or other facsimile within such period. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for any responsive notice.

## ARTICLE XIII.
### TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the Oil and Gas Leases and/or Oil and Gas Interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any Lease or Oil and Gas Interest contributed by any other party beyond the term of this agreement.

☒ Option No. 1: So long as any of the Oil and Gas Leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.

☐ Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in the Completion of a well as a well capable of production of Oil and/or Gas in paying quantities, this agreement shall continue in force so long as any such well is capable of production, and for an additional period of _____ days thereafter; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, Reworking, Deepening, Sidetracking, Plugging Back, testing or attempting to Complete or Re-complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is capable of producing Oil and/or Gas from the Contract Area, this agreement shall terminate unless drilling, Deepening, Sidetracking, Completing, Re-completing, Plugging Back or Reworking operations are commenced within _____ days from the date of abandonment of said well. "Abandonment" for such purposes shall mean either (i) a decision by all parties not to conduct any further operations on the well or (ii) the elapse of 180 days from the conduct of any operations on the well, whichever first occurs.

The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any remedy therefor which has accrued or attached prior to the date of such termination.

Upon termination of this agreement and the satisfaction of all obligations hereunder, in the event a memorandum of this Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon request of Operator, if Operator has satisfied all its financial obligations.

## ARTICLE XIV.
### COMPLIANCE WITH LAWS AND REGULATIONS

A. Laws, Regulations and Orders:

This agreement shall be subject to the applicable laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations and orders.

B. Governing Law:

This agreement and all matters pertaining hereto, including but not limited to matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of   New York ·   shall govern.

C. Regulatory Agencies:

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or

- 16 -

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT - 1989

orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to the operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or Federal Energy Regulatory Commission or predecessor or successor agencies to the extent such interpretation or application was made in good faith and does not constitute gross negligence. Each Non-Operator further agrees to reimburse Operator for such Non-Operator's share of production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

ARTICLE XV.

MISCELLANEOUS

A. Execution:

This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. Operator may, however, by written notice to all Non-Operators who have become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Initial Well but in no event later than five days prior to the date specified in Article VI.A. for commencement of the Initial Well, terminate this agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of drilling operations. In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease as of such termination. In the event any Non-Operator has advanced or prepaid any share of drilling or other costs hereunder, all sums so advanced shall be returned to such Non-Operator without interest. In the event Operator proceeds with drilling operations for the Initial Well without the execution hereof by all persons listed on Exhibit "A" as having a current working interest in such well, Operator shall indemnify Non-Operators with respect to all costs incurred for the Initial Well which would have been charged to such person under this agreement if such person had executed the same and Operator shall receive all revenues which would have been received by such person under this agreement if such person had executed the same.

B. Successors and Assigns:

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or Interests included within the Contract Area.

C. Counterparts:

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

D. Severability:

For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws, this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to this agreement to comply with all of its financial obligations provided herein shall be a material default.

ARTICLE XVI.

OTHER PROVISIONS

1. This JOA is made subject to the terms and conditions of the Participation and Exploration Agreement between the Parties effective August 8, 2005 and if conflicts arise, the Participation and Exploration Agreement shall prevail.
2. This JOA is made subject to the terms and conditions of that certain Agreement between Buck Mountain Associates, Inc. and Southwestern Oil Company and Western Land Services, Inc. dated June 1, 2005. If conflicts arise, that Agreement shall prevail.
3. The Parties agree that once certain obligations as spelled out in the Participation and Exploration Agreement have been met, Epsilon Energy USA, Inc. shall be named Operator by the Parties to this JOA.
4. The Parties agree to execute additional Exhibit A's to this JOA designating the Parties Interest in wells and units containing acreage subject to the Agreements set out in 1 and 2 above. Each subsequent Exhibit A shall be treated as a separate JOA under the same terms and conditions as contained herein.
5. If one of the Parties to this Agreement proposes a well under this Agreement, the Parties agree to negotiate and execute a COPAS Agreement and attached as Exhibit C to this JOA.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1   IN WITNESS WHEREOF, this agreement shall be effective as of the _____ day of _____,

2   _____.

3   _____, who has prepared and circulated this form for execution, represents and warrants
    that the form was printed from and, with the exception(s) listed below, is identical to the A.A.P.L. Form 610-1989 Model Form
4   Operating Agreement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or
    modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in
5   Articles _____, have been made to the form.

6   ATTEST OR WITNESS:                        OPERATOR

7                                             _____Southwestern Oil Company_____

8   _____        By _____

9   _____           _____
                                              Type or print name
10

11                                            Title _____

12                                            Date _____

13                                            Tax ID or S.S. No. _____

14

15                                        NON-OPERATORS

16
17                                            _____Epsilon Energy USA, Inc._____

                                          By _____
18  _____           _____David Heinz_____
                                              Type or print name
19

20                                            Title __Vice President Exploration_____

21                                            Date _____

22                                            Tax ID or S.S. No. _____

23

24                                            _____Western Land Services, Inc._____
25
                                          By _____
26  _____           _____John K. Wilson_____
                                              Type or print name
27

28                                            Title __President_____

29                                            Date _____

30                                            Tax ID or S.S. No. _____

31
32                                            _____
                                          By _____
33  _____           _____
                                              Type or print name
34

35                                            Title _____

36                                            Date _____

37                                            Tax ID or S.S. No. _____

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1

## ACKNOWLEDGMENTS

2     Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts.

3   The validity and effect of these forms in any state will depend upon the statutes of that state.

4

5   Individual acknowledgment:

6   State of _____ )

7                ) ss.

8   County of _____ )

9     This instrument was acknowledged before me on

10   _____ by _____

11

12   (Seal, if any)                           _____

13                                  Title (and Rank) _____

14                                   My commission expires: _____

15

16   Acknowledgment in representative capacity:

17   State of _____ )

18                ) ss.

19   County of _____ )

20     This instrument was acknowledged before me on

21   _____ by _____ as

22   _____ of _____ .

23   (Seal, if any)                           _____

24                                   Title (and Rank) _____

25                                   My commission expires: _____

26

27

28

29

30

31

32

33

34

35

36

37

EXHIBIT A

1.    DESCRIPTION OF LANDS SUBJECT TO THIS AGREEMENT

All oil and gas leases acquired by the Parties in the contract area

2.    PARTIES TO AGREEMENT WITH ADDRESSES, TELEPHONE AND FAX
NUMBERS FOR NOTICE PURPOSES AS SET FORTH IN AGREEMENT

**Southwestern Oil Company**
Jeffrey Cook, President
Southwestern Oil Company
P.O. Box 460
225 N. Layfayette St.
Greenville, MI  48838
Phone: (616) 754-7149
Fax:    (616) 754-5947

**Epsilon Energy USA, Inc.**
David Heinz, Vice President Exploration
Epsilon Energy USA, Inc.
1100 Conrad Industrial Drive
Ludington, Michigan 49431
Phone: (231) 845-8959
Fax:    (231) 843-3183

**Western Land Services, Inc.**
John K. Wilson, President
Western Land Services, Inc.
1100 Conrad Industrial Drive
Ludington, Michigan 49431
Phone: (231) 843-8878
Fax:    (231) 843-3183

3.    PERCENTAGE OF FRACTIONAL WORKING INTEREST OF PARTIES TO
THIS AGREEMENT

| | |
|---|---|
| Southwestern Oil Company | 25% |
| Western Land Services, Inc. | 25% |
| Epsilon Energy USA, Inc. | 50% |

4.    OIL AND GAS LEASES SUBJECT TO THIS AGREEMENT

All leases acquired by the Parties under the terms of the Participation Agreement
and Leasing Agreement.



c o p a s

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

EXHIBIT " C "
ACCOUNTING PROCEDURE
JOINT OPERATIONS

Attached to and made part of  Joint Operating Agreement dated August 8, 2005 by and between Southwestern Oil Company as Operator,

Western Land Services, Inc. and Epsilon Energy USA, Inc. as non operators

I. GENERAL PROVISIONS

IF THE PARTIES FAIL TO SELECT EITHER ONE OF COMPETING "ALTERNATIVE" PROVISIONS, OR SELECT ALL THE
COMPETING "ALTERNATIVE" PROVISIONS, ALTERNATIVE 1 IN EACH SUCH INSTANCE SHALL BE DEEMED TO HAVE
BEEN ADOPTED BY THE PARTIES AS A RESULT OF ANY SUCH OMISSION OR DUPLICATE NOTATION.

IN THE EVENT THAT ANY "OPTIONAL" PROVISION OF THIS ACCOUNTING PROCEDURE IS NOT ADOPTED BY THE
PARTIES TO THE AGREEMENT BY A TYPED, PRINTED OR HANDWRITTEN INDICATION, SUCH PROVISION SHALL NOT
FORM A PART OF THIS ACCOUNTING PROCEDURE, AND NO INFERENCE SHALL BE MADE CONCERNING THE INTENT
OF THE PARTIES IN SUCH EVENT.

1.   DEFINITIONS

All terms used in this Accounting Procedure shall have the following meaning, unless otherwise expressly defined in the Agreement:

"Affiliate" means for a person, another person that controls, is controlled by, or is under common control with that person. In this
definition, (a) control means the ownership by one person, directly or indirectly, of more than fifty percent (50%) of the voting securities
of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an
individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.

"Agreement" means the operating agreement, farmout agreement, or other contract between the Parties to which this Accounting
Procedure is attached.

"Controllable Material" means Material that, at the time of acquisition or disposition by the Joint Account, as applicable, is so classified
in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies (COPAS).

"Equalized Freight" means the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest
Railway Receiving Point to the property.

"Excluded Amount" means a specified excluded trucking amount most recently recommended by COPAS.

"Field Office" means a structure, or portion of a structure, whether a temporary or permanent installation, the primary function of which is
to directly serve daily operation and maintenance activities of the Joint Property and which serves as a staging area for directly chargeable
field personnel.

"First Level Supervision" means those employees whose primary function in Joint Operations is the direct oversight of the Operator's
field employees and/or contract labor directly employed On-site in a field operating capacity. First Level Supervision functions may
include, but are not limited to:

- Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance,
construction, well remedial work, equipment movement and drilling
- Responsibility for day-to-day direct oversight of rig operations
- Responsibility for day-to-day direct oversight of construction operations
- Coordination of job priorities and approval of work procedures
- Responsibility for optimal resource utilization (equipment, Materials, personnel)
- Responsibility for meeting production and field operating expense targets
- Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental
part of the supervisor's operating responsibilities
- Responsibility for all emergency response with field staff
- Responsibility for implementing safety and environmental practices
- Responsibility for field adherence to company policy
- Responsibility for employment decisions and performance appraisals for field personnel
- Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group
or team leaders

"Joint Account" means the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be
shared by the Parties, but does not include proceeds attributable to hydrocarbons and by-products produced under the Agreement.

"Joint Operations" means all operations necessary or proper for the exploration, appraisal, development, production, protection,
maintenance, repair, abandonment, and restoration of the Joint Property.

COPYRIGHT © 2005 by COPAS, Inc.

1



c o p a s

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

1    "Joint Property" means the real and personal property subject to the Agreement.

3    "Laws" means any laws, rules, regulations, decrees, and orders of the United States of America or any state thereof and all other
4    governmental bodies, agencies, and other authorities having jurisdiction over or affecting the provisions contained in or the transactions
5    contemplated by the Agreement or the Parties and their operations, whether such laws now exist or are hereafter amended, enacted,
6    promulgated or issued.

8    "Material" means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

10   "Non-Operators" means the Parties to the Agreement other than the Operator.

12   "Offshore Facilities" means platforms, surface and subsea development and production systems, and other support systems such as oil and
13   gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping,
14   heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of
15   offshore operations, all of which are located offshore.

17   "Off-site" means any location that is not considered On-site as defined in this Accounting Procedure.

19   "On-site" means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include that portion of
20   Offshore Facilities, Shore Base Facilities, fabrication yards, and staging areas from which Joint Operations are conducted, or other
21   facilities that directly control equipment on the Joint Property, regardless of whether such facilities are owned by the Joint Account.

23   "Operator" means the Party designated pursuant to the Agreement to conduct the Joint Operations.

25   "Parties" means legal entities signatory to the Agreement or their successors and assigns. Parties shall be referred to individually as
26   "Party."

28   "Participating Interest" means the percentage of the costs and risks of conducting an operation under the Agreement that a Party agrees,
29   or is otherwise obligated, to pay and bear.

31   "Participating Party" means a Party that approves a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of
32   the costs and risks of conducting an operation under the Agreement.

34   "Personal Expenses" means reimbursed costs for travel and temporary living expenses.

36   "Railway Receiving Point" means the railhead nearest the Joint Property for which freight rates are published, even though an actual
37   railhead may not exist.

39   "Shore Base Facilities" means onshore support facilities that during Joint Operations provide such services to the Joint Property as a
40   receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication,
41   scheduling and dispatching center; and other associated functions serving the Joint Property.

43   "Supply Store" means a recognized source or common stock point for a given Material item.

45   "Technical Services" means services providing specific engineering, geoscience, or other professional skills, such as those performed by
46   engineers, geologists, geophysicists, and technicians, required to handle specific operating conditions and problems for the benefit of Joint
47   Operations; provided, however, Technical Services shall not include those functions specifically identified as overhead under the second
48   paragraph of the introduction of Section III (Overhead). Technical Services may be provided by the Operator, Operator's Affiliate, Non-
49   Operator, Non-Operator Affiliates, and/or third parties.

51   2.   STATEMENTS AND BILLINGS

53   The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the
54   preceding month. Such bills shall be accompanied by statements that identify the AFE (authority for expenditure), lease or facility, and all
55   charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be separately identified
56   and fully described in detail, or at the Operator's option, Controllable Material may be summarized by major Material classifications.
57   Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.

59   The Operator may make available to Non-Operators any statements and bills required under Section 12 and/or Section 1.3.A (Advances
60   and Payments by the Parties) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper
61   copies. The Operator shall provide the Non-Operators instructions and any necessary information to access and receive the statements and
62   bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of
63   weekends and holidays) after the Operator notifies the Non-Operator that the statement or billing is available on the website and/or sent via
64   email or electronic data interchange transmission. Each Non-Operator individually shall elect to receive statements and billings
65   electronically, if available from the Operator, or request paper copies. Such election may be changed upon thirty (30) days prior written
66   notice to the Operator.

COPYRIGHT © 2005 by COPAS, Inc.



c o p a s

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

3. ADVANCES AND PAYMENTS BY THE PARTIES

A. Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding month's operations within fifteen (15) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the amount to be refunded to the subsequent month's billing or advance, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within fifteen (15) days of receipt of such written request.

B. Except as provided below, each Party shall pay its proportionate share of all bills in full within fifteen (15) days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed. Notwithstanding the foregoing, the Non-Operator may reduce payment, provided it furnishes documentation and explanation to the Operator at the time payment is made, to the extent such reduction is caused by:

   (1)  being billed at an incorrect working interest or Participating Interest that is higher than such Non-Operator's actual working interest or Participating Interest, as applicable; or

   (2)  being billed for a project or AFE requiring approval of the Parties under the Agreement that the Non-Operator has not approved or is not otherwise obligated to pay under the Agreement; or

   (3)  being billed for a property in which the Non-Operator no longer owns a working interest, provided the Non-Operator furnished the Operator a copy of the recorded assignment or letter in-lieu. Notwithstanding the foregoing, the Non-Operator shall remain responsible for paying bills attributable to the interest it sold or transferred for any bills rendered during the thirty (30) day period following the Operator's receipt of such written notice; or

   (4)  charges outside the adjustment period, as provided in Section 1.4 (*Adjustments*).

4. ADJUSTMENTS

A. Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements, including payout statements, rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto making a claim for adjustment. The Operator shall provide a response to all written exceptions, whether or not contained in an audit report, within the time periods prescribed in Section 1.5 (*Expenditure Audits*).

B. All adjustments initiated by the Operator, except those described in items (1) through (4) of this Section 1.4.B, are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Operator's Joint Account statement or payout statement. Adjustments that may be made beyond the twenty-four (24) month period are limited to adjustments resulting from the following:

   (1)  a physical inventory of Controllable Material as provided for in Section V (*Inventories of Controllable Material*); or

   (2)  an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Operator relating to another property; or

   (3)  a government/regulatory audit; or

   (4)  a working interest ownership or Participating Interest adjustment.

5. EXPENDITURE AUDITS

A. A Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section 1.4 (*Adjustments*). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for such hydrocarbons as they pertain to payout accounting required under the Agreement. Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered.

Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner that will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of

COPYRIGHT © 2005 by COPAS, Inc.

3



c o p a s

these Non-Operators approving such audit.

The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after completion of the audit testing and analysis; however, the ninety (90) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required in Section 14.A (*Adjustments*) above. All claims shall be supported with sufficient documentation.

A timely filed written exception or audit report containing written exceptions (hereinafter "written exceptions") shall, with respect to the claims made therein, preclude the Operator from asserting a statute of limitations defense against such claims, and the Operator hereby waives its right to assert any statute of limitations defense against such claims for so long as any Non-Operator continues to comply with the deadlines for resolving exceptions provided in this Accounting Procedure. If the Non-Operators fail to comply with the additional deadlines in Section 1.5.B or 1.5.C, the Operator's waiver of its rights to assert a statute of limitations defense against the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations, provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section 1.5.B or 1.5.C.

B.   The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator receives such report. Denied exceptions should be accompanied by a substantive response. If the Operator fails to provide substantive response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section 1.3.B (*Advances and Payments by the Parties*).

C.   The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt; provided, however, each Non-Operator shall have the right to represent itself if it disagrees with the lead audit company's position or believes the lead audit company is not adequately fulfilling its duties. Unless otherwise provided for in Section 1.5.E, if the Operator fails to provide substantive response to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section 1.3.B (*Advances and Payments by the Parties*).

D.   If any Party fails to meet the deadlines in Sections 1.5.B or 1.5.C or if any audit issues are outstanding fifteen (15) months after Operator receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution meeting, as set forth in this Section 1.5.D or it may invoke the dispute resolution procedures included in the Agreement, if applicable. The meeting will require one month's written notice to the Operator and all Non-Operators participating in the audit. The meeting shall be held at the Operator's office or mutually agreed location, and shall be attended by representatives of the Parties with authority to resolve such outstanding issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution reached at the meeting. The lead audit company will make good faith efforts to coordinate the response and positions of the Non-Operator participants throughout the resolution process; however, each Non-Operator shall have the right to represent itself. Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. A resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting may be discussed at subsequent meetings until each such issue is resolved.

If the Agreement contains no dispute resolution procedures and the audit issues cannot be resolved by negotiation, the dispute shall be submitted to mediation. In such event, promptly following one Party's written request for mediation, the Parties to the dispute shall choose a mutually acceptable mediator and share the costs of mediation services equally. The Parties shall each have present at the mediation at least one individual who has the authority to settle the dispute. The Parties shall make reasonable efforts to ensure that the mediation commences within sixty (60) days of the date of the mediation request. Notwithstanding the above, any Party may file a lawsuit or complaint (1) if the Parties are unable after reasonable efforts, to commence mediation within sixty (60) days of the date of the mediation request, (2) for statute of limitations reasons, or (3) to seek a preliminary injunction or other provisional judicial relief, if in its sole judgment an injunction or other provisional relief is necessary to avoid irreparable damage or to preserve the status quo. Despite such action, the Parties shall continue to try to resolve the dispute by mediation.

E.   ☐ (*Optional Provision – Forfeiture Penalties*)
     *If the Non-Operators fail to meet the deadline in Section 1.5.C, any unresolved exceptions that were not addressed by the Non-Operators within one (1) year following receipt of the last substantive response of the Operator shall be deemed to have been withdrawn by the Non-Operators. If the Operator fails to meet the deadlines in Section 1.5.B or 1.5.C, any unresolved exceptions that were not addressed by the Operator within one (1) year following receipt of the audit report or receipt of the last substantive response of the Non-Operators, whichever is later, shall be deemed to have been granted by the Operator and adjustments shall be made, without interest, to the Joint Account.*

6.   **APPROVAL BY PARTIES**

A.   **GENERAL MATTERS**

     Where an approval or other agreement of the Parties or Non-Operators is expressly required under other Sections of this Accounting Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the

COPYRIGHT © 2005 by COPAS, Inc.



c o p a s

Operator shall notify all Non-Operators of the Operator's proposal and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

This Section I.6.A applies to specific situations of limited duration where a Party proposes to change the accounting for charges from that prescribed in this Accounting Procedure. This provision does not apply to amendments to this Accounting Procedure, which are covered by Section I.6.B.

B.   AMENDMENTS

If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, this Accounting Procedure can be amended by an affirmative vote of _____ (_____) or more Parties, one of which is the Operator, having a combined working interest of at least _____ percent (_____%), which approval shall be binding on all Parties, provided, however, approval of at least one (1) Non-Operator shall be required.

C.   AFFILIATES

For the purpose of administering the voting procedures of Sections I.6.A and I.6.B, if Parties to this Agreement are Affiliates of each other, then such Affiliates shall be combined and treated as a single Party having the combined working interest or Participating Interest of such Affiliates.

For the purposes of administering the voting procedures in Section I.6.A, if a Non-Operator is an Affiliate of the Operator, votes under Section I.6.A shall require the majority in interest of the Non-Operator(s) after excluding the interest of the Operator's Affiliate.

## II.  DIRECT CHARGES

The Operator shall charge the Joint Account with the following items:

1.   RENTALS AND ROYALTIES

Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations.

2.   LABOR

A.   Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), for:

(1)   Operator's field employees directly employed On-site in the conduct of Joint Operations.

(2)   Operator's employees directly employed on Shore Base Facilities, Offshore Facilities, or other facilities serving the Joint Property if such costs are not charged under Section II.6 (*Equipment and Facilities Furnished by Operator*) or are not a function covered under Section III (*Overhead*).

(3)   Operator's employees providing First Level Supervision.

(4)   Operator's employees providing On-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

(5)   Operator's employees providing Off-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

Charges for the Operator's employees identified in Section II.2.A may be made based on the employee's actual salaries and wages, or in lieu thereof, a day rate representing the Operator's average salaries and wages of the employee's specific job category.

Charges for personnel chargeable under this Section II.2.A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U.S. employee pursuant to this Section II.2, unless otherwise approved by the Parties pursuant to Section I.6.A (*General Matters*).

B.   Operator's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Section II.2.A, excluding severance payments or other termination allowances. Such costs under this Section II.2.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Section II.2.A. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.   Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Sections II.2.A and B.

COPYRIGHT © 2005 by COPAS, Inc.

5



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

c o p a s

D.  Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A when the expenses are incurred in connection with directly chargeable activities.

E.  Reasonable relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A. Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party, or that are for the primary benefit of the Operator, shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of transfers from remote locations, such as Alaska or overseas, shall not be charged to the Joint Account unless approved by the Parties pursuant to Section I.6.A (General Matters).

F.  Training costs as specified in COPAS MFI-35 ("Charging of Training Costs to the Joint Account") for personnel whose salaries and wages are chargeable under Section II.2.A. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session. The training cost shall be charged or allocated to the property or properties directly benefiting from the training. The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G.  Operator's current cost of established plans for employee benefits, as described in COPAS MFI-27 ("Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation"), applicable to the Operator's labor costs chargeable to the Joint Account under Sections II.2.A and B based on the Operator's actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H.  Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") for personnel whose salaries and wages are chargeable under Section II.2.A.

3.  MATERIAL

Material purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV (Material Purchases, Transfers, and Dispositions). Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

4.  TRANSPORTATION

A.  Transportation of the Operator's, Operator's Affiliate's, or contractor's personnel necessary for Joint Operations.

B.  Transportation of Material between the Joint Property and another property, or from the Operator's warehouse or other storage point to the Joint Property, shall be charged to the receiving property using one of the methods listed below. Transportation of Material from the Joint Property to the Operator's warehouse or other storage point shall be paid for by the Joint Property using one of the methods listed below:

(1)  If the actual trucking charge is less than or equal to the Excluded Amount the Operator may charge actual trucking cost or a theoretical charge from the Railway Receiving Point to the Joint Property. The basis for the theoretical charge is the per hundred weight charge plus fuel surcharges from the Railway Receiving Point to the Joint Property. The Operator shall consistently apply the selected alternative.

(2)  If the actual trucking charge is greater than the Excluded Amount, the Operator shall charge Equalized Freight. Accessorial charges such as loading and unloading costs, split pick-up costs, detention, call out charges, and permit fees shall be charged directly to the Joint Property and shall not be included when calculating the Equalized Freight.

5.  SERVICES

The cost of contract services, equipment and utilities used in the conduct of Joint Operations, except for contract services, equipment, and utilities covered by Section III (Overhead), or Section II.7 (Affiliates), or excluded under Section II.9 (Legal Expense). Awards paid to contractors shall be chargeable pursuant to COPAS MFI-49 ("Awards to Employees and Contractors").

The costs of third party Technical Services are chargeable to the extent excluded from the overhead rates under Section III (Overhead).

6.  EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows:

A.  The Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including but not limited to production facilities, Shore Base Facilities, Offshore Facilities, and Field Offices, at rates commensurate with the costs of ownership and operation. The cost of Field Offices shall be chargeable to the extent the Field Offices provide direct service to personnel who are chargeable pursuant to Section II.2.A (Labor). Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation using straight line depreciation method, and interest on gross intangible less accumulated depreciation not to exceed _____ percent ( _____ %) per annum; provided, however, depreciation shall not be charged when the



**c o p a s**

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

~~equipment and facilities investment have been fully depreciated. The rate may include an element of the estimated cost for~~
~~abandonment, reclamation, and dismantlement.~~ Such rates shall not exceed the average commercial rates currently prevailing in the immediate area of the Joint Property.

B. In lieu of charges in Section II.6.A above, the Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, less twenty percent (20%). If equipment and facilities are charged under this Section II.6.B, the Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation. For automotive equipment, the Operator may elect to use rates published by the Petroleum Motor Transport Association (PMTA) or such other organization recognized by COPAS as the official source of rates.

**7. AFFILIATES**

A. Charges for an Affiliate's goods and/or services used in operations requiring an AFE or other authorization from the Non-Operators may be made without the approval of the Parties provided (i) the Affiliate is identified and the Affiliate goods and services are specifically detailed in the approved AFE or other authorization, and (ii) the total costs for such Affiliate's goods and services billed to such individual project do not exceed $ _5,000.00_____ . If the total costs for an Affiliate's goods and services charged to such individual project are not specifically detailed in the approved AFE or authorization or exceed such amount, charges for such Affiliate shall require approval of the Parties, pursuant to Section I.6.A (General Matters).

B. For an Affiliate's goods and/or services used in operations not requiring an AFE or other authorization from the Non-Operators, charges for such Affiliate's goods and services shall require approval of the Parties, pursuant to Section I.6.A (General Matters), if the charges exceed $ _5,000.00_____ in a given calendar year.

C. The cost of the Affiliate's goods or services shall not exceed average commercial rates prevailing in the area of the Joint Property, unless the Operator obtains the Non-Operators' approval of such rates. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation; provided, however, documentation of commercial rates shall not be required if the Operator obtains Non-Operator approval of its Affiliate's rates or charges prior to billing Non-Operators for such Affiliate's goods and services. Notwithstanding the foregoing, direct charges for Affiliate-owned communication facilities or systems shall be made pursuant to Section II.12 (Communications).

If the Parties fail to designate an amount in Sections II.7.A or II.7.B, in each instance the amount deemed adopted by the Parties as a result of such omission shall be the amount established as the Operator's expenditure limitation in the Agreement. If the Agreement does not contain an Operator's expenditure limitation, the amount deemed adopted by the Parties as a result of such omission shall be zero dollars ($ 0.00).

**8. DAMAGES AND LOSSES TO JOINT PROPERTY**

All costs or expenses necessary for the repair or replacement of Joint Property resulting from damages or losses incurred, except to the extent such damages or losses result from a Party's or Parties' gross negligence or willful misconduct, in which case such Party or Parties shall be solely liable.

The Operator shall furnish the Non-Operator written notice of damages or losses incurred as soon as practicable after a report has been received by the Operator.

**9. LEGAL EXPENSE**

Recording fees and costs of handling, settling, or otherwise discharging litigation, claims, and liens incurred in or resulting from operations under the Agreement, or necessary to protect or recover the Joint Property, to the extent permitted under the Agreement. Costs of the Operator's or Affiliate's legal staff or outside attorneys, including fees and expenses, are not chargeable unless approved by the Parties pursuant to Section I.6.A (General Matters) or otherwise provided for in the Agreement.

Notwithstanding the foregoing paragraph, costs for procuring abstracts, fees paid to outside attorneys for title examinations (including preliminary, supplemental, shut-in royalty opinions, division order title opinions), and curative work shall be chargeable to the extent permitted as a direct charge in the Agreement.

**10. TAXES AND PERMITS**

All taxes and permitting fees of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to the Parties will be made in accordance with the tax value generated by each Party's working interest.

COPYRIGHT © 2005 by COPAS, Inc.



c o p a s

1    Costs of tax consultants or advisors, the Operator's employees, or Operator's Affiliate employees in matters regarding ad valorem or other
2    tax matters, are not permitted as direct charges unless approved by the Parties pursuant to Section I.6.A (*General Matters*).
3
4    Charges to the Joint Account resulting from sales/use tax audits, including extrapolated amounts and penalties and interest, are permitted,
5    provided the Non-Operator shall be allowed to review the invoices and other underlying source documents which served as the basis for
6    tax charges and to determine that the correct amount of taxes were charged to the Joint Account. If the Non-Operator is not permitted to
7    review such documentation, the sales/use tax amount shall not be directly charged unless the Operator can conclusively document the
8    amount owed by the Joint Account.
9
10   **11. INSURANCE**
11
12    Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties. If Joint Operations are
13    conducted at locations where the Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance
14    obligation, the Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the
15    jurisdiction governing the Joint Property. In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be
16    used for personnel performing work On-site, and such rates shall be adjusted for offshore operations by the U.S. Longshoreman and
17    Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.
18
19   **12. COMMUNICATIONS**
20
21    Costs of acquiring, leasing, installing, operating, repairing, and maintaining communication facilities or systems, including satellite, radio
22    and microwave facilities, between the Joint Property and the Operator's office(s) directly responsible for field operations in accordance
23    with the provisions of COPAS MFI-44 ("Field Computer and Communication Systems"). If the communications facilities or systems
24    serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Section II.6 (*Equipment and*
25    *Facilities Furnished by Operator*). If the communication facilities or systems serving the Joint Property are owned by the Operator's
26    Affiliate, charges to the Joint Account shall not exceed average commercial rates prevailing in the area of the Joint Property. The Operator
27    shall adequately document and support commercial rates and shall periodically review the rate and the supporting
28    documentation.
29
30   **13. ECOLOGICAL, ENVIRONMENTAL, AND SAFETY**
31
32    Costs incurred for Technical Services and drafting to comply with ecological, environmental and safety Laws or standards recommended by
33    Occupational Safety and Health Administration (OSHA) or other regulatory authorities. All other labor and functions incurred for
34    ecological, environmental and safety matters, including management, administration, and permitting, shall be covered by Sections II.2
35    (*Labor*), II.5 (*Services*), or Section III (*Overhead*), as applicable.
36
37    Costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting
38    responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable Laws, or other pollution
39    containment and removal equipment deemed appropriate by the Operator for prudent operations, are directly chargeable.
40
41   **14. ABANDONMENT AND RECLAMATION**
42
43    Costs incurred for abandonment and reclamation of the Joint Property, including costs required by lease agreements or by Laws.
44
45   **15. OTHER EXPENDITURES**
46
47    Any other expenditure not covered or dealt with in the foregoing provisions of this Section II (*Direct Charges*), or in Section III
48    (*Overhead*) and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the
49    Joint Operations. Charges made under this Section II.15 shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).
50
51
52                      **III. OVERHEAD**
53
54   As compensation for costs not specifically identified as chargeable to the Joint Account pursuant to Section II (*Direct Charges*), the Operator
55   shall charge the Joint Account in accordance with this Section III.
56
57   Functions included in the overhead rates regardless of whether performed by the Operator, Operator's Affiliates or third parties and regardless
58   of location, shall include, but not be limited to, costs and expenses of:
59
60      • warehousing, other than for warehouses that are jointly owned under this Agreement
61      • design and drafting (except when allowed as a direct charge under Sections II.13, III.1.A(ii), and III.2, Option B)
62      • inventory costs not chargeable under Section V (*Inventories of Controllable Material*)
63      • procurement
64      • administration
65      • accounting and auditing
66      • gas dispatching and gas chart integration

COPYRIGHT © 2005 by COPAS, Inc.



c o p a s

1  • human resources
2  • management
3  • supervision not directly chargeable under Section II.9 (*Legal Expense*)
4  • legal services not directly chargeable under Section II.9 (*Legal Expense*)
5  • taxation, other than those costs identified as directly chargeable under Section II.10 (*Taxes and Permits*)
6  • preparation and monitoring of permits and certifications; preparing regulatory reports; appearances before or meetings with
7    governmental agencies or other authorities having jurisdiction over the Joint Property, other than On-site inspections; reviewing,
8    interpreting, or submitting comments on or lobbying with respect to Laws or proposed Laws.
9
10  Overhead charges shall include the salaries or wages plus applicable payroll burdens, benefits, and Personal Expenses of personnel performing
11  overhead functions, as well as office and other related expenses of overhead functions.
12
13  **I.   OVERHEAD—DRILLING AND PRODUCING OPERATIONS**
14
15      As compensation for costs incurred but not chargeable under Section II (*Direct Charges*) and not covered by other provisions of this
16      Section III, the Operator shall charge on either:
17
18      ☑  (Alternative 1)  Fixed Rate Basis, Section III.1.B.
19      ☐  (Alternative 2)  Percentage Basis, Section III.1.C.
20
21      **A.   TECHNICAL SERVICES**
22
23          (i)   Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section II.2 (*Overhead – Major
24                Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages,
25                related payroll burdens and benefits, and Personal Expenses for On-site Technical Services, including third party Technical
26                Services:
27
28          ☑  (Alternative 1 – Direct) shall be charged *direct* to the Joint Account.
29
30          ☐  (Alternative 2 – Overhead) shall be covered by the overhead rates.
31
32          (ii)  Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section II.2 (*Overhead – Major
33                Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages,
34                related payroll burdens and benefits, and Personal Expenses for Off-site Technical Services, including third party Technical
35                Services:
36
37          ☐  (Alternative 1 – All Overhead) shall be covered by the overhead rates.
38
39          ☑  (Alternative 2 – All Direct) shall be charged *direct* to the Joint Account.
40
41          ☐  (Alternative 3 – Drilling Direct) shall be charged *direct* to the Joint Account, only to the extent such Technical Services
42                are directly attributable to drilling, redrilling, deepening, or sidetracking operations, through completion, temporary
43                abandonment, or abandonment if a dry hole. Off-site Technical Services for all other operations, including workover,
44                recompletion, abandonment of producing wells, and the construction or expansion of fixed assets not covered by Section
45                III.2 (*Overhead - Major Construction and Catastrophe*) shall be covered by the overhead rates.
46
47      Notwithstanding anything to the contrary in this Section III, Technical Services provided by Operator's Affiliates are subject to limitations
48      set forth in Section II.7 (*Affiliates*). Charges for Technical personnel performing non-technical work shall not be governed by this Section
49      III.1.A, but instead governed by other provisions of this Accounting Procedure relating to the type of work being performed.
50
51      **B.   OVERHEAD—FIXED RATE BASIS**
52
53          (1)   The Operator shall charge the Joint Account at the following rates per well per month:
54
55                Drilling Well Rate per month $ 5,600.00_____ (prorated for less than a full month)
56
57                Producing Well Rate per month $ 580.00_____
58
59          (2)   Application of Overhead—Drilling Well Rate shall be as follows:
60
61                (a)   Charges for onshore drilling wells shall begin on the spud date and terminate on the date the drilling and/or completion
62                      equipment used on the well is released, whichever occurs later. Charges for offshore and inland waters drilling wells shall
63                      begin on the date the drilling or completion equipment arrives on location and terminate on the date the drilling or completion
64                      equipment moves off location, or is released, whichever occurs first. No charge shall be made during suspension of drilling
65                      and/or completion operations for fifteen (15) or more consecutive calendar days.
66

COPYRIGHT © 2005 by COPAS, Inc.



COPAS

(b) Charges for any well undergoing any type of workover, recompletion, and/or abandonment for a period of five (5) or more consecutive work-days shall be made at the Drilling Well Rate. Such charges shall be applied for the period from date operations, with rig or other units used in operations, commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3) Application of Overhead—Producing Well Rate shall be as follows:

(a) An active well that is produced, injected into for recovery or disposal, or used to obtain water supply to support operations for any portion of the month shall be considered as a one-well charge for the entire month.

(b) Each active completion in a multi-completed well shall be considered as a one-well charge provided each completion is considered a separate well by the governing regulatory authority.

(c) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well, unless the Drilling Well Rate applies, as provided in Sections III.1.B.(2)(a) or (b). This one-well charge shall be made whether or not the well has produced.

(d) An active gas well shut in because of overproduction or failure of a purchaser, processor, or transporter to take production shall, be considered as a one-well charge provided the gas well is directly connected to a permanent sales outlet.

(e) Any well not meeting the criteria set forth in Sections III.1.B.(3) (a), (b), (c), or (d) shall not qualify for a producing overhead charge.

(4) The well rates shall be adjusted on the first day of April each year following the effective date of the Agreement; provided, however, if this Accounting Procedure is attached to or otherwise governing the payout accounting under a farmout agreement, the rates shall be adjusted on the first day of April each year following the effective date of such farmout agreement. The adjustment shall be computed by applying the adjustment factor most recently published by COPAS. The adjusted rates shall be the initial or amended rates agreed to by the Parties increased or decreased by the adjustment factor described herein, for each year from the effective date of such rates, in accordance with COPAS MFI-47 ("Adjustment of Overhead Rates").

C.   OVERHEAD   PERCENTAGE BASIS

(1) Operator shall charge the Joint Account at the following rates:

(a) Development Rate _____ percent ( ____ ) % of the cost of development of the Joint Property, exclusive of costs provided under Section II.9 (Legal Expense) and all Material salvage credits.

(b) Operating Rate _____ percent ( ____ %) of the cost of operating the Joint Property, exclusive of costs provided under Sections II.1 (Rentals and Royalties) and II.9 (Legal Expense); all Material salvage credits; the value of substances purchased for enhanced recovery; all property and ad valorem taxes, and any other taxes and assessments that are levied, assessed, and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead—Percentage Basis shall be as follows:

(a) The Development Rate shall be applied to all costs in connection with:

[i]   drilling, redrilling, sidetracking, or deepening of a well
[ii]  a well undergoing plugback or workover operations for a period of five (5) or more consecutive work-days
[iii] preliminary expenditures necessary in preparation for drilling
[iv]  expenditures incurred in abandoning when the well is not completed as a producer
[v]   construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, other than Major Construction or Catastrophe as defined in Section III.2 (Overhead Major Construction and Catastrophe).

(b) The Operating Rate shall be applied to all other costs in connection with Joint Operations, except those subject to Section III.2 (Overhead Major Construction and Catastrophe).

2.   OVERHEAD—MAJOR CONSTRUCTION AND CATASTROPHE

To compensate the Operator for overhead costs incurred in connection with a Major Construction project or Catastrophe, the Operator shall either negotiate a rate prior to the beginning of the project, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of the Operator's expenditure limit under the Agreement, or for any Catastrophe regardless of the amount. If the Agreement to which this Accounting Procedure is attached does not contain an expenditure limit, Major Construction Overhead shall be assessed for any single Major Construction project costing in excess of $100,000 gross.



c o p a s

Major Construction shall mean the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernable as a fixed asset required for the development and operation of the Joint Property, or in the dismantlement, abandonment, removal, and restoration of platforms, production equipment, and other operating facilities.

Catastrophe is defined as a sudden calamitous event bringing damage, loss, or destruction to property or the environment, such as an oil spill, blowout, explosion, fire, storm, hurricane, or other disaster. The overhead rate shall be applied to those costs necessary to restore the Joint Property to the equivalent condition that existed prior to the event.

A.   If the Operator absorbs the engineering, design and drafting costs related to the project:

(1)   _____5_____ % of total costs if such costs are less than $100,000; plus

(2)   _____3_____ % of total costs in excess of $100,000 but less than $1,000,000; plus

(3)   _____1_____ % of total costs in excess of $1,000,000.

B.   If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

(1)   _____5_____ % of total costs if such costs are less than $100,000; plus

(2)   _____3_____ % of total costs in excess of $100,000 but less than $1,000,000; plus

(3)   _____1_____ % of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single Major Construction project shall not be treated separately, and the cost of drilling and workover wells and purchasing and installing pumping units and downhole artificial lift equipment shall be excluded. For Catastrophes, the rates shall be applied to all costs associated with each single occurrence or event.

On each project, the Operator shall advise the Non-Operator(s) in advance which of the above options shall apply.

For the purposes of calculating Catastrophe Overhead, the cost of drilling relief wells, substitute wells, or conducting other well operations directly resulting from the catastrophic event shall be included. Expenditures to which these rates apply shall not be reduced by salvage or insurance recoveries. Expenditures that qualify for Major Construction or Catastrophe Overhead shall not qualify for overhead under any other overhead provisions.

In the event of any conflict between the provisions of this Section III.2 and the provisions of Sections II.2 (*Labor*), II.5 (*Services*), or II.7 (*Affiliates*), the provisions of this Section III.2 shall govern.

3.   AMENDMENT OF OVERHEAD RATES

The overhead rates provided for in this Section III may be amended from time to time if, in practice, the rates are found to be insufficient or excessive, in accordance with the provisions of Section I.6.B (*Amendments*).

## IV. MATERIAL PURCHASES, TRANSFERS, AND DISPOSITIONS

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Operator shall provide all Material for use in the conduct of Joint Operations; however, Material may be supplied by the Non-Operators, at the Operator's option. Material furnished by any Party shall be furnished without any express or implied warranties as to quality, fitness for use, or any other matter.

1.   DIRECT PURCHASES

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received. The Operator shall make good faith efforts to take discounts offered by suppliers, but shall not be liable for failure to take discounts except to the extent such failure was the result of the Operator's gross negligence or willful misconduct. A direct purchase shall be deemed to occur when an agreement is made between an Operator and a third party for the acquisition of Material for a specific well site or location. Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the manufacturer, distributor, or agent until usage, is considered a direct purchase. If Material is found to be defective or is returned to the manufacturer, distributor, or agent for any other reason, credit shall be passed to the Joint Account within sixty (60) days after the Operator has received adjustment from the manufacturer, distributor, or agent.

COPYRIGHT © 2005 by COPAS, Inc.



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

2. **TRANSFERS**

A transfer is determined to occur when the Operator (i) furnishes Material from a storage facility or from another operated property, (ii) has assumed liability for the storage costs and changes in value, and (iii) has previously secured and held title to the transferred Material. Similarly, the removal of Material from the Joint Property to a storage facility or to another operated property is also considered a transfer, provided, however, Material that is moved from the Joint Property to a storage location for safe-keeping pending disposition may remain charged to the Joint Account and is not considered a transfer. Material shall be disposed of in accordance with Section IV.3 (*Disposition of Surplus*) and the Agreement to which this Accounting Procedure is attached.

A. **PRICING**

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of physical transfer. Regardless of the pricing method used, the Operator shall make available to the Non-Operators sufficient documentation to verify the Material valuation. When higher than specification grade or size tubulars are used in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars, unless such higher specification grade or sized tubulars are approved by the Parties pursuant to Section I.6.A (*General Matters*). Transfers of new Material shall be priced using one of the following pricing methods; provided, however, the Operator shall use consistent pricing methods, and not alternate between methods for the purpose of choosing the method most favorable to the Operator for a specific transfer:

(1) Using published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).

(a) For oil country tubulars and line pipe, the published price shall be based upon eastern mill carload base prices (Houston, Texas, for special end) adjusted as of date of movement, plus transportation cost as defined in Section IV.2.B (*Freight*).

(b) For other Material, the published price shall be the published list price in effect at date of movement, as listed by a Supply Store nearest the Joint Property where like Material is normally available, or point of manufacture plus transportation costs as defined in Section IV.2.B (*Freight*).

(2) Based on a price quotation from a vendor that reflects a current realistic acquisition cost.

(3) Based on the amount paid by the Operator for like Material in the vicinity of the Joint Property within the previous twelve (12) months from the date of physical transfer.

(4) As agreed to by the Participating Parties for Material being transferred to the Joint Property, and by the Parties owning the Material for Material being transferred from the Joint Property.

B. **FREIGHT**

Transportation costs shall be added to the Material transfer price using the method prescribed by the COPAS Computerized Equipment Pricing System (CEPS). If not using CEPS, transportation costs shall be calculated as follows:

(1) Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the Railway Receiving Point based on the carload weight basis as recommended by the COPAS MFI-38 ("Material Pricing Manual") and other COPAS MFIs in effect at the time of the transfer.

(2) Transportation costs for special mill items shall be calculated from that mill's shipping point to the Railway Receiving Point. For transportation costs from other than eastern mills, the 30,000-pound interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the interstate truck rate per weight of tubing transferred to the Railway Receiving Point.

(3) Transportation costs for special end tubular goods shall be calculated using the interstate truck rate from Houston, Texas, to the Railway Receiving Point.

(4) Transportation costs for Material other than that described in Sections IV.2.B (1) through (3), shall be calculated from the Supply Store or point of manufacture, whichever is appropriate, to the Railway Receiving Point.

Regardless of whether using CEPS or manually calculating transportation costs, transportation costs from the Railway Receiving Point to the Joint Property are in addition to the foregoing, and may be charged to the Joint Account based on actual costs incurred. All transportation costs are subject to Equalized Freight as provided in Section II.4 (*Transportation*) of this Accounting Procedure.

C. **TAXES**

Sales and use taxes shall be added to the Material transfer price using either the method contained in the COPAS Computerized Equipment Pricing System (CEPS) or the applicable tax rate in effect for the Joint Property at the time and place of transfer. In either case, the Joint Account shall be charged or credited at the rate that would have governed had the Material been a direct purchase.

COPYRIGHT © 2005 by COPAS, Inc.

12



c o p a s

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

D.   CONDITION

(1)   Condition "A" – New and unused Material in sound and serviceable condition shall be charged at one hundred percent (100%) of the price as determined in Sections IV.2.A (Pricing), IV.2.B (Freight), and IV.2.C (Taxes). Material transferred from the Joint Property that was not placed in service shall be credited as charged without gain or loss; provided, however, any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking fees charged by the vendor. New and unused Material transferred from the Joint Property may be credited at a price other than the price originally charged to the Joint Account provided such price is approved by the Parties owning such Material, pursuant to Section 1.6.A (General Matters). All refurbishing costs required or necessary to return the Material to original condition or to correct handling, transportation, or other damages will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material provided these services were not repeated for such Material for the receiving property.

(2)   Condition "B" – Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (Pricing), IV.2.B (Freight), and IV.2.C (Taxes) by seventy-five percent (75%).

Except as provided in Section IV.2.D(3), all reconditioning costs required to return the Material to Condition "B" or to correct handling, transportation or other damages will be borne by the divesting property.

If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Sections IV.2.A (Pricing), IV.2.B (Freight), and IV.2.C (Taxes) multiplied by sixty-five percent (65%).

Unless otherwise agreed to by the Parties that paid for such Material, used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3)   Condition "C" – Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (Pricing), IV.2.B (Freight), and IV.2.C (Taxes) by fifty percent (50%).

The cost of reconditioning may be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4)   Condition "D" – Material that (i) is no longer suitable for its original purpose but usable for some other purpose, (ii) is obsolete, or (iii) does not meet original specifications but still has value and can be used in other applications as a substitute for items with different specifications, is considered Condition "D" Material. Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B stainless line pipe of comparable size and weight. Used casing, tubing, or drill pipe utilized as line pipe shall be priced at used line pipe prices. Casing, tubing, or drill pipe used as higher pressure service lines than standard line pipe, e.g., power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis. For other items, the price should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material, or as agreed to by the Parties pursuant to Section 1.6.A (General Matters).

(5)   Condition "E"– Junk shall be priced at prevailing scrap value prices.

E.   OTHER PRICING PROVISIONS

(1)   Preparation Costs

Subject to Section II (Direct Charges) and Section III (Overhead) of this Accounting Procedure, costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be provided to the Non-Operators upon request to support the cost of service. New coating and/or wrapping shall be considered a component of the Materials and priced in accordance with Sections IV.1 (Direct Purchases) or IV.2.A (Pricing), as applicable. No charges or credits shall be made for used coating or wrapping. Charges and credits for inspections shall be made in accordance with COPAS MFI-38 ("Material Pricing Manual").

(2)   Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS MFI-38 ("Material Pricing Manual").

COPYRIGHT © 2005 by COPAS, Inc.

-13



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

c o p a s

3.   DISPOSITION OF SURPLUS

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operators in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus Material, the Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a third party, division in kind, or other dispositions as agreed to by the Parties.

Disposal of surplus Materials shall be made in accordance with the terms of the Agreement to which this Accounting Procedure is attached. If the Agreement contains no provisions governing disposal of surplus Material, the following terms shall apply.

- The Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Agreement to which this Accounting Procedure is attached without the prior approval of the Parties owning such Material.

- If the gross sale value exceeds the Agreement expenditure limit, the disposal must be agreed to by the Parties owning such Material.

- Operator may purchase surplus Condition "A" or "B" Material without approval of the Parties owning such Material, based on the pricing methods set forth in Section IV.2 (Transfers).

- Operator may purchase Condition "C" Material without prior approval of the Parties owning such Material if the value of the Materials, based on the pricing methods set forth in Section IV.2 (Transfers), is less than or equal to the Operator's expenditure limitation set forth in the Agreement. The Operator shall provide documentation supporting the classification of the Material as Condition C.

- Operator may dispose of Condition "D" or "E" Material under procedures normally utilized by Operator without prior approval of the Parties owning such Material.

4.   SPECIAL PRICING PROVISIONS

A.   PREMIUM PRICING

Whenever Material is available only at inflated prices due to national emergencies, strikes, government imposed foreign trade restrictions, or other unusual causes over which the Operator has no control, for direct purchase the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, making it suitable for use, and moving it to the Joint Property. Material transferred or disposed of during premium pricing situations shall be valued in accordance with Section IV.2 (Transfers) or Section IV.3 (Disposition of Surplus), as applicable.

B.   SHOP-MADE ITEMS

Items fabricated by the Operator's employees, or by contract laborers under the direction of the Operator, shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item. If the Material is from the Operator's scrap or junk account, the Material shall be priced at either twenty-five percent (25%) of the current price as determined in Section IV.2.A (Pricing) or scrap value, whichever is higher. In no event shall the amount charged exceed the value of the item commensurate with its use.

C.   MILL REJECTS

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent (80%) of K-55/J-55 price as determined in Section IV.2 (Transfers). Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

## V. INVENTORIES OF CONTROLLABLE MATERIAL

The Operator shall maintain records of Controllable Material charged to the Joint Account, with sufficient detail to perform physical inventories.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of Controllable Material shall be made within twelve (12) months following the taking of the inventory or receipt of Non-Operator inventory report. Charges and credits for overages or shortages will be valued for the Joint Account in accordance with Section IV.2 (Transfers) and shall be based on the Condition "B" prices in effect on the date of physical inventory unless the inventorying Parties can provide sufficient evidence another Material condition applies.

COPYRIGHT © 2005 by COPAS, Inc.



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

## c o p a s

1. **DIRECTED INVENTORIES**

Physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators (hereinafter, "directed inventory"); provided, however, the Operator shall not be required to perform directed inventories more frequently than once every five (5) years. Directed inventories shall be commenced within one hundred eighty (180) days after the Operator receives written notice that a majority in interest of the Non-Operators has requested the inventory. All Parties shall be governed by the results of any directed inventory.

Expenses of directed inventories will be borne by the Joint Account; provided, however, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Any anticipated disproportionate or extraordinary costs should be discussed and agreed upon prior to commencement of the inventory. Expenses of directed inventories may include the following:

A. A per diem rate for each inventory person, representative of actual salaries, wages, and payroll burdens and benefits of the personnel performing the inventory or a rate agreed to by the Parties pursuant to Section I.6.A (*General Matters*). The per diem rate shall also be applied to a reasonable number of days for pre-inventory work and report preparation.

B. Actual transportation costs and Personal Expenses for the inventory team.

C. Reasonable charges for report preparation and distribution to the Non-Operators.

2. **NON-DIRECTED INVENTORIES**

A. **OPERATOR INVENTORIES**

Physical inventories that are not requested by the Non-Operators may be performed by the Operator, at the Operator's discretion. The expenses of conducting such Operator-initiated inventories shall not be charged to the Joint Account.

B. **NON-OPERATOR INVENTORIES**

Subject to the terms of the Agreement to which this Accounting Procedure is attached, the Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk after giving the Operator at least ninety (90) days prior written notice. The Non-Operator inventory report shall be furnished to the Operator in writing within ninety (90) days of completing the inventory fieldwork.

C. **SPECIAL INVENTORIES**

The expense of conducting inventories other than those described in Sections V.1 (*Directed Inventories*), V.2.A (*Operator Inventories*), or V.2.B (*Non-Operator Inventories*), shall be charged to the Party requesting such inventory; provided, however, inventories required due to a change of Operator shall be charged to the Joint Account in the same manner as described in Section V.1 (*Directed Inventories*).

COPYRIGHT © 2005 by COPAS, Inc.

EXHIBIT "_   _ THE
JOINT OPERATING AGREEMENT
DATED August 8, 2005

### INSURANCE EXHIBIT

Operator shall provide the following insurance covering operations under this Agreement for the benefit of the parties to the Agreement to which this Exhibit is attached:

(a)   Workers Compensation as required by law.

(b)   Commercial General Liability covering bodily injury, death, personal injury and property damage with a combined single limit of not less than $1,000,000 per occurrence. This policy shall include broad form contractual liability, underground resources and pollution liability.

(c)   Automobile Liability insurance covering all owned and non-owned vehicles used by Operator. This policy shall cover bodily injury, death and property damage with a combined single limit of not less than $1,000,000 per occurrence.

(d)   Commercial Umbrella Liability insurance covering bodily injury, death, personal injury and property damage with a combined single limit of not less than $3,000,000. This policy shall be excess Employer's Liability, General Liability and Automobile Liability, and shall provide coverage at least as broad as these underlying policies.

Operator shall cover all Non-Operators as Additional Insureds on the above referenced policies, and, with the exception of the insurance coverage in (c) above, Non-Operators shall pay Operator their proportionate share of the premium for such coverage. Operator shall provide Non-Operators a certificate of insurance evidencing the above referenced prior to the commencement of work.

# EXHIBIT B

# SOUTHWESTERN OIL COMPANY

P.O. BOX 460    GREENVILLE, MI 48838-0460    616 754-7149

## JOINT VENTURE AGREEMENT

**SOUTHWESTERN OIL COMPANY**, a Michigan corporation (hereinafter called **SWO**) of PO Box 460, 225 N. Lafayette St., Greenville, Michigan 48838 is the owner of certain Oil and Gas Leases in New York State's Trenton Black River exploration play. Said leases are more fully described in Exhibit "A" attached hereto and made a part hereof and cover approximately 12,000 net mineral acres.

**EPSILON ENERGY USA, INC.,** an Ohio corporation (hereinafter called **EPSILON**) of 1100 Conrad Industrial Dr., Ludington, Michigan 49431 desires to acquire a one-half interest in such Oil and Gas Leases and finance the development of these leases and the acquisition of additional Oil and Gas Leases in the Trenton Black River exploration play.

For and in consideration of the mutual benefits accruing, **SWO** and **EPSILON** hereby agree as follows:

A.    **SWO** and **EPSILON** agree to form an area of mutual interest covering Steuben, Chemung and Tioga Counties, New York and all oil and gas interests purchased in this area by either party will be considered subject to the terms of this agreement.

B.    All Oil and Gas Leases described in Exhibit "A" will be considered subject to this agreement.   These leases are delivered hereunder with an 80% net revenue interest.

C.    **EPSILON** agrees to spend the sum of $4,000,000 U.S. either by paying costs invoiced to them for Oil and Gas leases or mineral rights, seismic data acquisition, drilling, testing and completion expenditures in the drilling of a well, pipeline and other infrastructure expenditures for such well and legal and administration expenses or, in the alternative, pay sums directly to SWO until the amount specified above has been paid.

D.    SWO shall act as operator under this agreement and shall consult with Epsilon regarding the scope and nature of the expenditure of funds within the AMI. As operator **SWO** shall issue invoices at least monthly covering all expenditures made under this agreement.   **EPSILON** shall pay all such invoices within 45 days of receipt.  If, at any time, $50,000 U.S. or more in receivables remains unpaid for more than 45 days, **EPSILON** shall be

considered as in default and **SWO** will have the option and power to declare this agreement terminated. In such case, **EPSILON** will be considered to have earned a percentage of all property subject to this agreement and paid for by **EPSILON** equal to their expenditures over $4,000,000 U.S. x 37.5% (i.e., ¾ of a 50% interest). In illustration, if the agreement is terminated after **EPSILON** has expended $1,000,000 U.S., their ownership percentage would be $1,000,000 / $4,000,000 x 37.5% or 9.375%.

E.   After **EPSILON** has fulfilled its $4,000,000 U.S. obligation under this agreement, it will be considered as owner of a 50% interest in all property subject to this agreement. At such time or when a lesser percentage is earned as set forth in "D" above, **SWO** and **EPSILON** shall execute a Joint Operating Agreement on an AAPL 610 Form including a provision for joint loss and a 300% penalty for nonparticipation in drilling or completion activity and forfeiture of any interest in any acquisition in which a party elects not to pay its share of the costs (See Copy Attached for reference).

F.   Any revenues accruing to properties subject to this agreement after the effective date of this Agreement but before **EPSILON** has paid the $4,000,000 U.S. required above and before a percentage less than 50% is earned as set forth in "D" above shall be paid entirely to and for the benefit of **SWO** except that one-quarter (1/4) of such revenue shall be considered as credited to the obligation of **EPSILON** to pay $4,000,000 U.S. hereunder. After **EPSILON** has paid $4,000,000 U.S. or a percentage less than 50% is earned, as set forth in "D" above, all revenues received shall be shared according to the interests owned under this agreement or any Joint Operating Agreement executed as provided herein.

G.   **SWO** intends to contract with a landman to assist in the acquisition of additional property interests in the AMI. The landman may be compensated by being given an overriding royalty or working interest in the properties he helps acquire and EPSILON agrees to be responsible for their share of resulting burdens in addition to the burdens existing under "B" above.

H.   This Agreement and all documents executed pursuant hereto and the legal relationship between the parties with respect to this Agreement shall be governed and construed in accordance to the laws of the State of New York.

I.   It is not the intent of the parties hereto to create a partnership, joint venture or association relationship nor to create the position of employer and employee. The intent hereof is to establish the relationship of co-owners of certain properties subject to this Agreement.

J.   This Agreement and the Exhibits hereto shall constitute the entire agreement between the parties with respect to the subject matter covered hereby and shall

supersede all other writings, understandings (written or oral) or memoranda entered into or discussed before the execution hereof.

K.   In case any provision or obligation under this Agreement is invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions, or of such provisions or obligations in any other jurisdiction, shall not in any way be affected or impaired thereby.

L.   This Agreement shall remain in force so long as there are any properties subject to this Agreement still in existence except that once the parties hereto have executed a Joint Operating Agreement as provided for in "E" above, either party can elect to terminate the Agreement and deeds, assignments, bills of sale and other transfer documents will be executed to transfer to each party hereto its ownership percentage in these properties.

M.   This Agreement shall be binding upon and inure to the benefit of the successors and assigns of the Parties.

EXECUTED this 8th day of August, 2005, however made effective the 1st day of June, 2005.


SOUTHWESTERN OIL COMPANY

By: _____
Jeffrey D. Cook
President


EPSILON ENERGY USA, INC.

By: _____
John K. Wilson, President

# EXHIBIT C

## PARTICIPATION AND EXPLORATION AGREEMENT

THIS PARTICIPATION AND EXPLORATION AGREEMENT ("Agreement") is made effective as of August 8, 2005, by and between SOUTHWESTERN OIL COMPANY, a Michigan corporation, ("SWO"), WESTERN LAND SERVICES, INC., a Michigan corporation ("WLS"), and EPSILON ENERGY USA, INC., an Ohio corporation, ("Epsilon"). SWO and WLS are sometimes hereinafter collectively referred to as the "Sellers"; Epsilon is sometimes hereinafter referred to as the "Buyer"; and SWO, WLS and Epsilon are sometimes hereinafter collectively referred to as the "Parties".

### W-I-T-N-E-S-S-E-T-H:

WHEREAS SWO AND WLS are owners of certain oil and gas leases covering lands in Steuben, Chemung, Schuyler, Tioga and Otsego Counties, New York ("AMI"); and

WHEREAS SWO AND WLS have entered into an Agreement dated June 1, 2005 with Buck Mountain Associates Inc. ("BMA") whereby, BMA agreed to acquire oil and gas leases in the AMI lands on behalf of SWO and WLS, in exchange for, among other things, an option to acquire ten percent (10%) of the leasehold working interest in the leases so acquired (the "BMA" Agreement"); and

WHEREAS, Epsilon desires to acquire a fifty percent (50%) working interest in and to said oil and gas leases from Sellers, as well as the right to participate to the extent of fifty percent (50%) of the leasehold interests subsequently acquired by Sellers in the AMI lands, subject to the interest of BMA; and

WHEREAS, is the express desire of the Parties to set forth in this Agreement the terms and conditions that will govern the identification, acquisition, exploration and development of prospects within the AMI along with the rights and obligations of the Parties with respect to the activities contemplated herein.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein, the receipt and adequacy of which is hereby acknowledged, the Parties hereto hereby agree as follows:

1.   Definitions. As used in this Agreement, the following words and terms shall have the meanings here ascribed to them:

    a.   AMI or Area of Mutual Interest: The term "AMI" shall be the geographic area comprised of Steuben, Chemung, Schuyler, Tioga and Otsego Counties, New York. The geographic boundaries of the AMI may be amended only by a written instrument signed by all Parties.

    b.   AMI Operator: The "AMI Operator" shall be SWO, or its designee, until such time as Epsilon has fulfilled its obligations pursuant to Section 3 below, at which time Epsilon shall be named as the AMI Operator.

    c.   Oil and Gas Leases: The term "Oil and Gas Leases" shall mean those leases or interests in leases covering oil and gas interests within the AMI acquired prior to the

effective date hereof, as well as those leases or interest in leases acquired by any of the Parties hereto or by BMA on behalf of any of the Parties hereto, subsequent to the effective date hereof, through the date this Agreement terminates. The Oil and Gas Leases acquired through the date this Agreement is executed, are more fully identified on Exhibit A attached hereto.

d. <u>Subject Interests</u>: The term "Subject Interests" shall mean oil and gas interests and rights (other than the Oil and Gas Leases) acquired by, or belonging to or for the benefit of the Sellers, Epsilon and/or their respective Affiliates, only insofar as they lie within the AMI, including, but not limited to all Oil and Gas Leases, oil and gas owned in fee simple, term mineral interests, gas storage rights, interests previously earned or capable of being earned by farmin and farmout, including options to acquire any interest. The term "Subject Interests" shall also include all oil and gas lease options, dry hole, bottom hole, or acreage contribution agreements, seismic options, farm outs, farm ins or tax partnership agreements or any other option or interest relating to exploration for the development of oil and gas within the AMI.

e. <u>Joint Operating Agreement</u>: A "Joint Operating Agreement" or "JOA" shall be a contract between the Parties, their Affiliates and any other party or entity owning an interest in Oil and Gas Leases and Subject Interests governing the operation of the Oil and Gas Leases and Subject Interests, which shall be in the form attached hereto as Exhibit B. A separate Joint Operating Agreement will be executed by the Parties, upon the election to participate in each well drilled within the AMI lands. Furthermore the Parties agree that upon Epsilon's fulfillment of its obligation under Section 3b of this Agreement, the Parties shall enter into a JOA covering all of the Oil and Gas Leases and Subject Interests not then covered by an existing JOA. The terms and conditions of the form Joint Operating Agreement shall be deemed to be incorporated in this Agreement for all purposes and shall control all proposals and operations relating to the AMI, the Oil and Gas Lease, the Subject Interests and all other activities contemplated by this Agreement which are not controlled by a separately executed Joint Operating Agreement for a particular well or proposed well. SWO shall be named as Operator in each Joint Operating Agreement, until such time as Epsilon has fulfilled its obligations pursuant to Section 3, below, at which time SWO shall resign as operator and Epsilon shall be named as the operator for the well covered by each JOA. For purposes of this Agreement, the term Joint Operating Agreement shall be deemed to include both the terms and provisions of the attached Exhibit B, and in any and all Joint Operating Agreements separately executed on a well by well basis, from time to time hereafter, whichever is applicable. The Joint Operating Agreement Contract Area shall include all lands, Oil and Gas Leases and Subject Interests within a proposed well's drilling unit, production unit or pooled or unitized area, whichever is larger, which are jointly owned by Seller, Epsilon, their Affiliates, and other parties and entities owning an interest in the Oil and Gas Leases and Subject Interests. In the event of conflict between the provisions of this Agreement and any Joint Operating Agreement, the provisions of this Agreement shall prevail insofar as the interest of Sellers and Epsilon or their Affiliates or their assignees are involved in such conflict.

f. <u>Affiliate</u>. The term "Affiliate" shall mean a parties' parent company, a subsidiary or any entity which owns or controls either directly or indirectly through one or more intermediaries, fifty percent (50%) or more of a Parties outstanding stock

2

membership interest. Affiliate shall also refer to all members of limited liability company, owners of a corporation or partners of a partnership, their agents, representatives, assignees, principals, employees, and trusts.

2.    Term.   This Agreement shall commence and be effective as of August 8, 2005, (the "effective date") and control the subject matter hereof until the period which is five (5) years from the date of the effective date; upon the expiration of the term of this Agreement, each separate Joint Operating Agreement shall remain in full force and effect and shall control the terms and conditions of the joint operations for each well developed under this Agreement, until each well ceases to produce.

3.    Agreement Purpose.

a.   Sellers or their Affiliates own good and defensible title to the Oil and Gas Leases listed on Exhibit A, insofar as they cover the AMI lands. Sellers will hold for the account of Epsilon, an undivided one-half (½) interest in the Exhibit A, Oil and Gas Leases. Such leases shall be assigned to Epsilon (in the manner provided below) at eighty percent (80%) net revenue interest. Epsilon shall also be entitled to an undivided one-half (½) interest  in and to all Oil and Gas Leases subsequently acquired in the AMI by or on behalf of any of the Parties; including but not limited to any leases acquired by BMA under and pursuant to the BMA Agreement, a copy of which is attached hereto as Exhibit C (collectively the "Epsilon Interest"). The Epsilon Interest in the subsequently acquired Oil and Gas Leases shall be at the net revenue interest as acquired by the Sellers or BMA; and no additional overriding royalty interests or burdens shall be created or reserved by the Sellers or BMA.

b.   In exchange for the Epsilon Interest, Epsilon agrees to expend the sum of four million dollars ($4,000,000) from and after the effective date hereof (the "Epsilon Obligation") in the following manner:

(i)    Pay all costs associated with lease acquisition, legal and accounting services, geological/geophysical expenditures as proposed by Sellers and approved by Epsilon. In no event shall the foregoing costs and expenses exceed one million dollars ($1,000,000) per year without the consent of Epsilon, and 100% of all such expenditures shall be applied against the Epsilon Obligation.

(ii)   Pay all costs involved in the drilling, completing and equipping of all wells drilled by the Parties in the AMI, and one hundred  percent (100%) of all such expenditures shall be applied against the Epsilon Obligation, which amount shall be in addition to the one million dollars ($1,000,000) provided for in subsection 3b(i). Epsilon shall be entitled to receive fifty percent (50%) of all revenue generated from any wells drilled and completed in the AMI attributable to the Parties' Interest, from and after the date of first production, whether or not it has received an assignment of the Epsilon Interest therein, and whether or not it has satisfied the Epsilon Obligation.

Epsilon shall have the option, at its sole discretion, to pay off the Epsilon Obligation, in cash at any time, or from time to time during the term of this Agreement, whether or not then due under the foregoing schedule. The Parties acknowledge and agree that as of the date this Agreement is executed, Epsilon

3

has already expended an amount equal to **$1,967,785.00** against the Epsilon Obligation. The AMI Operator and Epsilon shall each keep accurate records of the status of the outstanding balance of the Epsilon Obligation, and shall reconcile their records at least quarterly.

4.    Interest of BMA. The Parties hereto acknowledge that under the BMA Agreement by and between Sellers and BMA. BMA is to acquire the Oil and Gas Leases in the AMI for the benefit of Sellers. Further the Agreement provides that BMA or its Affiliate, Stalis, shall have an option to acquire a ten percent (10%) working interest in units drilled within the AMI, limited to the leases in the AMI acquired by BMA under the BMA Agreement. The Parties further acknowledge and agree that if BMA elects to acquire such interest(s), the BMA interests shall be borne pro rata by the Parties. BMA shall pay its' proportionate share of all expenses relating to the wells from and after the time it so elects, and shall not be carried as to expenses related to any such well(s). Any expenses attributable to such percentage interest which have been previously paid by Epsilon shall be attributed to and applied against the Epsilon Obligation. If BMA elects not acquire the interest provided for in BMA Agreement as to any well drilled hereunder, then the working interest and the expenses attributable to such interest shall be attributed to and borne by the Parties in accordance with Section 2, above.

5.    Operations; Non-Consent.

a.    If at any time prior to the expenditure of the Epsilon Obligation, any Party, or any third party shall propose the drilling of a well on a unit including a portion of the AMI lands, the AMI Operator shall provide Epsilon with a detailed written notice of such proposal. Epsilon shall notify the AMI Operator within fifteen (15) days of its receipt of such notice whether it elects to participate in the proposed well as provided in Section 3 above. If Epsilon elects not to participate it shall be deemed to have surrendered its entire claim to the Oil and Gas Leases comprising the well unit, insofar only as they lie within the proposed well unit. If Epsilon elects to participate, the Parties hereto shall execute a Joint Operating Agreement in the form attached hereto as Exhibit B, naming SWO as operator. The Joint Operating Agreement shall provide that the operator will be changed to Epsilon upon the satisfaction of the Epsilon Obligation. Upon the execution of the Joint Operating Agreement, SWO and WLS shall assign to Epsilon an undivided one-half (½) interest in and to those Oil and Gas Leases within the unit for the proposed well, at the net revenue interest specified in Section 3a, above. Such election to participate shall apply in the same manner to all other operations with respect to the AMI lands, and in particular geological/geophysical operations and well completion or re-completion matters, such as the laying of pipelines and construction of any required well facilities.

b.    From and after the time that Epsilon has satisfied the Epsilon Obligation, the election to participate shall be reciprocal as to all of the Parties to this Agreement, and the failure of any Party to timely elect shall be subject to the terms of the attached Joint Operating Agreement. At such time as Epsilon has earned the Epsilon Interest by satisfying the Epsilon Obligation, it shall immediately be entitled to an assignment of the Epsilon Interest in all of the Oil and Gas Leases whether or not such leases are included in a producing unit. The Parties shall execute a JOA in the form attached hereto as Exhibit B, naming Epsilon as operator, joint loss and a non-participation penalty of three hundred

4

percent (300%) [cost plus two hundred percent (200%)] covering future operations and such Joint Operating Agreement shall govern all Parties' participation in the well. All pipelines, common facilities, seismic lines, geological and geophysical data and other personal property, data and materials shall be owned pro rata by the Parties.

6.    AMI Expenses.

a.    Prior to the satisfaction of the Epsilon Obligation, the AMI Operator shall invoice Epsilon for all approved AFE expenses and other expenses provided for in this Agreement. Epsilon shall have a period of thirty (30) days from and after receipt of such invoice to pay the applicable expense. If at any time prior to the satisfaction of the Epsilon Obligation, a total of fifty thousand dollars ($50,000) U.S., or more of receivables from approved AFE expenses and other expenses, remain unpaid for more than forty five (45) days after the thirty (30) day invoice notice period has expired, then Epsilon shall be deemed in default under this Agreement and Sellers shall have the option and power to declare this Agreement terminated. Such a determination shall require the consent of both WLS and SWO to terminate the interest of Epsilon. In the event that the Sellers do make such a determination and elect to terminate, then and in that event Epsilon shall forfeit all of its right, title and interest in and to all AMI acreage not subject to a JOA. This provision shall not apply to any Oil and Gas Leases and other AMI assets of the Parties in a unit for a proposed, drilling or producing well, as long as participation in such well has been elected by Epsilon as provided for in Section 5a, above. The Sellers agree to consult with Epsilon and seek Epsilon's approval prior to the acquisition of any acreage within the AMI for which Epsilon will be one hundred percent (100%) responsible for the payment of acquisition costs. Epsilon shall make a determination whether or not to participate in the proposed acquisition within forty-eight (48) hours of its receipt of notice of final terms and conditions of the proposed lease. In the event Epsilon shall fail to expend at least one million dollars ($1,000,000) on the Epsilon Obligation, as provided in Section 3b(i), as a result of its election not to participate as to any such acquisitions(s), then and in that event Epsilon shall pay Sellers the difference between the one million dollars ($1,000,000) and the amount expended by Epsilon for acreage acquisitions during that one (1) year period.

b.    All delay rentals, options payments and minimum royalty payments, or other payments, costs or expenses to be paid with respect to the Oil and Gas Leases or Subject Interests, if any, including lease acquisition costs shall be paid by the AMI Operator at or before the time due. Prior to satisfaction of the Epsilon Obligation, the AMI Operator shall invoice Epsilon for payment of all such payments, costs and expenses, and one hundred percent (100%) of all sums so expended shall be credited against the Epsilon Obligation. After satisfaction of the Epsilon Obligation, all such payments, costs and expenses shall be borne pro rata by the Parties.

7.    Epsilon Net Revenue. During the period specified in Section 3 above, Epsilon shall be entitled to receive the revenues attributable to its fifty percent (50%) interest in any wells drilled and

5

completed in the AMI, unless Epsilon has elected not to participate in the well or wells under Section 5, above.

8.      Common Facilities.  All common facilities within the AMI used for the production, gathering, processing, treating, transporting and marketing of production therefrom, and the disposal of salt water, including but not limited to, central facilities, salt water disposal wells, and all flow lines, sales lines and pipe lines shall be paid for by Epsilon up through the satisfaction of the Epsilon Obligation and thereafter by all Parties on a pro rata basis.  Such common facilities will be owned by the Parties from the time of purchase or acquisition pro rata in accordance with their interest in the AMI.

9.      Assignment – Additional Parties.  It is understood that no Party will assign or transfer any of its interest in the Oil and Gas Leases or other AMI assets without obtaining the expressed written consent of the remaining Parties, which Parties shall have an option to acquire the interest sought to be assigned or conveyed on the same terms and conditions as the proposed sale or assignment.  Each Party shall have a period of thirty (30) days from and after delivery of written notice of such proposed sale or assignment and all relevant terms thereof, to elect to acquire such interest.  Failing an appropriate election to acquire such interest, the assigning Party shall be free to assign or sell such interest as proposed to a third party.  Notwithstanding the foregoing no such approval shall be required to sell or assign all of or a portion of a Party's interest to its Affiliate.  The AMI Operator and/or the well operator may not assign more than fifty percent (50%) of their interest in the AMI, or the applicable well unit, respectively, and remain the operator thereof, without the written consent of all other Parties to this Agreement.

10.     Subchapter K Election.  The Parties do not intend to create, nor shall this Agreement be construed to create, a partnership between the Parties nor does this Agreement render the Parties hereto liable as partners.  Nothing herein shall be construed as an authorization of one Party to act as general agent for the other Party nor to permit either Party to act for or on behalf of the other Party outside the terms of this Agreement

Notwithstanding any provision herein that the rights and liabilities hereunder are several and not joint and collective, or that this Agreement and operations hereunder shall not constitute a partnership, if, for federal income tax purposes this Agreement and the operations hereunder are regarded as a partnership, each Party hereby affected shall elect to be excluded from the application of all provisions of Subchapter K, Chapter 1, Subtitle A of the Internal Revenue Code of 1986, as permitted and authorized by Section 761 of the Code and regulations thereunder.

11.     Notices.  All notices authorized or required by the Parties hereto shall be given in writing (except as otherwise provided in this Agreement or the applicable Joint Operating Agreement) by certified or overnight mail, telephone, facsimile with confirmation of receipt or email, with, postage or charges prepared as follows:

        WLS
        1100 Conrad Industrial Drive
        Ludington, MI  49431-2679
        Attn: _____
        Phone: _____
        Fax: _____

SWO
225 N. Lafayette Street
Greenville, MI 48838
Attn: Jeffrey D. Cook
Phone: 616-754-7149
Fax: 616-754-5947


Epsilon
1100 Conrad Industrial Drive
Ludington, MI 49431-2679
Attn: _____
Phone: _____
Fax: _____

Each Party shall have the right to change its address, telephone number, or telefacsimile number for notice purposes at any time, and from time to time, by given written notice thereof to the other Parties. The original notice given under any provision of this Agreement shall be deemed given only when received by the Party(ies) to whom such notice is directed  The allotted time for the noticed Party(ies) to give any required response thereto shall begin on the date the original notice is received. Any required response shall be deemed as given when deposited in the mail as specified herein or when sent by telefacsimile with postage and charges prepaid.

12.   Representations and Warranties.   Unless specifically stated herein, all assignments provided for shall be without any warranty whatsoever, expressed or implied. Each Party represents that it has advised the others of all burdens, claims and lawsuits concerning the Oil and Gas Leases and the Subject Interests, or its operations within the AMI. Notwithstanding anything to the contrary, each Party shall defend, indemnify and hold the other Parties and their Affiliates harmless from and against all losses, claims, suits, liabilities, expenses and judgments for property damage, personal injury or death to the extend such arose out of facts which occurred prior to the effective date hereof.

13.   Force Majeure.   If any obligation, performance, act or operation required or authorized under this Agreement is delayed, interrupted or prevented by acts of God, fire, storm, flood, explosion, lightning, riots, war, strike, governmental order, rule, regulation, failure or inadequacy of transportation provided by common carriers, federal, state, or municipal law, regulation or ordinance, including any existing or subsequently enacted state, county, township or municipal law, rule, regulation or ordinance pertaining to seasonal or weather related use of, access to, or right to cross over any highway, road, or any other land surface in the State of New York, some of which are sometimes referred to as "frost laws", or the unavailability of a drilling rig, or any other condition beyond the reasonable control of the affected Party, then this Agreement and the rights granted hereunder shall not be terminated or forfeited nor shall the affected Party be found in default for failure to comply with any such required or authorized obligations, performances, acts or operations, and no right of damages or equitable relief shall exist against the affected Party by reason thereof. In the event a condition occurs as stated above, the requirement to commence, continue or complete any affected obligation, performance, act or operation required hereunder shall be suspended as long as such condition(s) exist; provided that any required obligation, performance, act or operation is resumed as soon as is reasonable possible, but not later than thirty (30) days after the date the condition ceases to exist.

7

14.     Miscellaneous Provisions

   a.     This Agreement and the matters pertaining hereto, including, but not limited to matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction shall be governed and determined by the laws of the State of Michigan.

   b.     This Agreement and the Exhibits attached hereto, constitute the entire agreement between the Parties and shall supersede all previous agreements affecting the subject matter addressed herein between the Parties whether written or verbal. No variations, modifications, or changes shall be binding on any Party unless set forth in a document duly execute by each of the Parties.

   c.     The provisions set forth in this Agreement shall constitute covenants running with the AMI land and the Oil and Gas Leases covered hereby, and shall extend to and be binding upon the respective representatives, successors and assigns of Sellers and Epsilon.

   d.     Neither this Agreement nor the Exhibit attached hereto are intended to create, nor shall the same be construed as creating, any mining partnership, commercial partnership or other partnership relationship or joint venture. Rather, it is the intent and purpose of this Agreement and the Exhibits attached hereto to create a relationship that is limited to the exploration, development and the extraction and processing of all oil and gas for division in kind or for sale for the accounts of the individual Parties hereto, and in which the liabilities of each of the Parties hereto shall be several and not joint or collective.

   e.     This Agreement may be signed in counterpart and a complete set of properly executed original signatures taken together shall constitute a fully executed original Agreement.

   IN WITNESS WHEREOF this Agreement has been executed as of the dates set forth below, but effective as of August 8, 2005.

                                        SOUTHWESTERN OIL COMPANY, a
                                        Michigan corporation

                                        By: _____

                                        Its: _President_____

                                        Dated: _May 22, 2006_____



                                        WESTERN LAND SERVICES, INC., a
                                        Michigan corporation

8

By: _____

Its: PresiDENT _____

Dated: MAY 25, 2006 _____

EPSILON ENERGY USA, INC., an Ohio corporation

By: _____

Its: Vice President of Exploration

Dated: 5/25/06 _____

I:\MHR\PARTICIPATION AND EXPLORATION AGREEMENT.050806.doc

9

# EXHIBIT D

A C C O U N T S   R E C E I V A B L E   S U M M A R Y   S T A T E M E N T

Owner Code:COOK02                                          Date:06/07/10

To: COOK INVESTMENTS                            From: EPSILON ENERGY USA, INC.
PO BOX 460                                             3343 STATE ROUTE 3004
225 N LAYFAYETTE ST                                    MESHOPPEN        PA 18630
GREENVILLE     MI 48838

------------------------Invoices From Previous Statements-----------------------

| Invoice Number | Well Code | Trans. Date | Transaction Description | | Tran Type | Amount |
|------|------|------|------|------|------|------|
| 3227 | 200-31 | 04/30/10 | BEAN E 1 | | JIB | $5,268.05 |
| | | | Netted Against Revenue: 02/10 | | Net | -$3,843.12 |
| | | 05/31/10 | Netted Against Revenue: 03/10 | | Net | -$1,424.93 |
| 3110 | 220-07 | 04/09/10 | Advance | | Adv. | $7,602.75 |
| | | 05/03/10 | Payment, Check# | 3226 | Pymt | -$7,602.75 |
| 3112 | 220-07 | 04/09/10 | Advance | | Adv. | $46,397.03 |
| | | 05/03/10 | Payment, Check# | 3226 | Pymt | -$46,397.03 |
| 3114 | 220-08 | 04/09/10 | Advance | | Adv. | $49,001.72 |
| | | 05/03/10 | Payment, Check# | 3226 | Pymt | -$49,001.72 |
| 3213 | 200-00 | 04/30/10 | EMPIRE PROJECT | | JIB | $61.25 |
| 3215 | 200-08 | 04/30/10 | F ANDREWS #1 UNIT | | JIB | $2.24 |
| 3217 | 200-10 | 04/30/10 | JANIAK #1 UNIT | | JIB | $101.32 |
| 3222 | 200-17 | 04/30/10 | WINTER G #1 UNIT | | JIB | $3,315.14 |
| | | 05/31/10 | Cross-Clear with Inv# | 3293 | XClr | -$3,307.88 |
| 3225 | 200-26 | 04/30/10 | ALLINGTON #1 | | JIB | $3,091.86 |
| | | 04/30/10 | Netted Against Revenue: 02/10 | | Net | -$1,411.65 |
| | | 05/31/10 | Netted Against Revenue: 03/10 | | Net | -$517.04 |
| 3228 | 220-00 | 04/30/10 | PARK PLACE | | JIB | $497.02 |
| 3118 | 220-00 | 05/04/10 | NY Park Place Seismic | | Adv. | $45,660.50 |
| 3229 | 220-05 · | 04/30/10 | TUBBS #2 | | JIB | $42,090.01 |
| | | 04/30/10 | Application of Advance | | AAdv | -$7,440.03 |
| 3230 | 220-06 | 04/30/10 | EVANS #1 | | JIB | $79,476.04 |
| | | 04/30/10 | Application of Advance | | AAdv | -$70,366.81 |

                              Balance of Previous Invoices     $91,251.97*
                                                             -----------------

------------------------New Invoices This Statement----------------------------

| Invoice Number | Well Code | Trans. Date | Transaction Description | Tran Type | Amount |
|------|------|------|------|------|------|
| 3287 | 200-06 | 05/31/10 | DZYBON #1 UNIT | JIB | $39.73 |
| | | 05/31/10 | Netted Against Revenue: 03/10 | Net | -$39.73 |
| 3288 | 200-09 | 05/31/10 | HULETT #1 UNIT | JIB | $3,578.00 |
| | | 05/31/10 | Netted Against Revenue: 03/10 | Net | -$3,578.00 |
| 3289 | 200-11 | 05/31/10 | LITTLE #1 UNIT | JIB | $462.81 |
| | | 05/31/10 | Netted Against Revenue: 03/10 | Net | -$462.81 |
| 3290 | 200-12 | 05/31/10 | PIETILLA R1 | JIB | $15.68 |
| | | 05/31/10 | Netted Against Revenue: 03/10 | Net | -$15.68 |
| 3291 | 200-14 | 05/31/10 | SODERBLOM #1 UNIT | JIB | $13.89 |
| | | 05/31/10 | Netted Against Revenue: 03/10 | Net | -$13.89 |

A C C O U N T S   R E C E I V A B L E   S U M M A R Y   S T A T E M E N T

Owner Code:COOK02    (Continued)                          Date:06/07/10

To: COOK INVESTMENTS                          From: EPSILON ENERGY USA, INC.
    PO BOX 460                                      3343 STATE ROUTE 3004
    225 N LAFFAYETTE ST                             MESHOPPEN       PA 18630
    GREENVILLE     MI 48838

------------------------New Invoices This Statement------------------------

| Invoice Number | Well Code | Trans. Date | Transaction Description | Tran Type | Amount |
|------|------|------|------|------|------|
| 3292 | 200-15 | 05/31/10 | STOSCHECK #1 UNIT | JIB | $8.27 |
| | | 05/31/10 | Netted Against Revenue: 03/10 | Net | -$8.27 |
| 3293 | 200-17 | 05/31/10 | WINTER G #1 UNIT | JIB | -$3,307.88 |
| | | 05/31/10 | Cross-Clear with Inv#   3222 | XClr | $3,307.88 |
| 3294 | 200-19 | 05/31/10 | SRA3 #1 | JIB | $20.44 |
| | | 05/31/10 | Netted Against Revenue: 03/10 | Net | -$20.44 |
| 3295 | 200-21 * | 05/31/10 | NOWLAN 1 | JIB | $425.69 |
| | | 05/31/10 | Netted Against Revenue: 03/10 | Net | -$425.69 |
| 3296 | 200-25 | 05/31/10 | RUSH D1 A | JIB | $39.46 |
| | | 05/31/10 | Netted Against Revenue: 03/10 | Net | -$39.46 |
| 3298 | 200-27 | 05/31/10 | POYSA E #1 | JIB | $3.64 |
| | | 05/31/10 | Netted Against Revenue: 03/10 | Net | -$3.64 |
| 3299 | 200-30 | 05/31/10 | WINTER G 1A (AREA 55) | JIB | $1,959.81 |
| | | 05/31/10 | Netted Against Revenue: 03/10 | Net | -$1,959.81 |
| 3300 | 200-31 | 05/31/10 | BEAN E 1 | JIB | $1,459.83 |
| | | 05/31/10 | Netted Against Revenue: 03/10 | Net | -$1,459.83 |
| 3301 | 200-32 | 05/31/10 | LANT #1 | JIB | $160.09 |
| | | 05/31/10 | Netted Against Revenue: 04/09 | Net | -$38.21 |
| | | 05/31/10 | Netted Against Revenue: 05/09 | Net | -$25.00 |
| | | 05/31/10 | Netted Against Revenue: 06/09 | Net | -$26.05 |
| | | 05/31/10 | Netted Against Revenue: 07/09 | Net | -$23.21 |
| | | 05/31/10 | Netted Against Revenue: 08/09 | Net | -$23.59 |
| | | 05/31/10 | Netted Against Revenue: 09/09 | Net | -$21.23 |
| | | 05/31/10 | Netted Against Revenue: 10/09 | Net | -$2.80 |
| 3305 | 220-07 | 05/31/10 | LARISON #2 | JIB | $4,020.61 |
| | | 05/31/10 | Application of Advance | AAdv | -$4,020.61 |
| 3306 | 220-08 | 05/31/10 | E EVANS #1 | JIB | $858.43 |
| | | 05/31/10 | Application of Advance | AAdv | -$858.43 |
| 3286 | 200-00 | 05/31/10 | EMPIRE PROJECT | JIB | $8,614.17 |
| 3297 | 200-26 | 05/31/10 | ALLINGTON #1 | JIB | $400.66 |
| 3302 | 220-00 | 05/31/10 | PARK PLACE | JIB | $25,672.38 |
| 3303 | 220-05 | 05/31/10 | TUBBS #2 | JIB | $52.18 |
| 3304 | 220-06 | 05/31/10 | EVANS #1 | JIB | $52.18 |

                                              ------------------
                          Total New Invoices       $34,791.57*
                                              ------------------

| Current | 30 Days | 60 Days | 90 Days |
|------|------|------|------|
| $34,791.57 | $91,251.97 | $0.00 | $0.00 |

                          Balance Due This Statement    $126,043.54**

A C C O U N T S   R E C E I V A B L E   S U M M A R Y   S T A T E M E N T

Owner Code:COOK02    (Continued)                    Date:06/07/10

To: COOK INVESTMENTS                            From: EPSILON ENERGY USA, INC.
    PO BOX 460                                         3343 STATE ROUTE 3004
    225 N LAYFAYETTE ST                                MESHOPPEN      PA 18630
    GREENVILLE      MI 48838
    --------------------------------------------------------------------------------
         Invoice   Well    Trans.        Transaction        Tran    Amount
         Number    Code    Date          Description        Type
         ------  --------- --------  --------------------------  ----  ------------------

              Due Upon Receipt

```
                        S U M M A R Y   O F   A D V A N C E S    ☐☐☐☐

        Owner Code:COOK02                                    Date:06/07/10

To: COOK INVESTMENTS                                  From: EPSILON ENERGY USA, INC.
    PO BOX 460                                               3343 STATE ROUTE 3004
    225 N LAFAYETTE ST                                       MESHOPPEN        PA 18630
    GREENVILLE     MI 48838
        ----------------------Advances Still Outstanding-----------------------------
        Adv.Inv#    Well '      Transaction        BCP     Advance    UnApplied
        / Date      Code        Description        /ACP    Amount      Amount
        --------  ----------  --------------------------  ---  ------------  ------------

                  3112 220-07  Advance                    BCP   $46,397.03   $36,125.95
        04/09/10 AFE:D10007 LARISON #2
                  3114 220-08  Advance                    BCP   $49,001.72   $23,892.50
        04/09/10 AFE:D10008 E EVANS #1
                  3118 220-00  NY Park Place Seismic       BCP   $45,660.50   $45,660.50
        05/04/10 AFE:S10009 2D SEISMIC DATA PARK PLACE
```

Outstanding Advances Totals  $141,059.25  $105,678.95**

ACCOUNTS  RECEIVABLE  SUMMARY  STATEMENT

Owner Code:AUST01                                          Date:06/07/10

To: AUSTIN EXPLORATION, LLC                    From: EPSILON ENERGY USA, INC.
    1100 CONRAD INDUSTRIAL DRIVE                      3343 STATE ROUTE 3004
    LUDINGTON      MI 49431                           MESHOPPEN      PA 18630

```
---------------------Invoices From Previous Statements-----------------------
Invoice   Well   Trans.        Transaction           Tran    Amount
Number    Code   Date          Description           Type
-------  ------- --------  ---------------------     ----  ----------------


 3179 200-00    04/30/10 EMPIRE PROJECT               JIB       $61.25
                05/27/10 Payment, Check#    7783      Pymt      -$61.25

 3181 200-08    04/30/10 F ANDREWS #1 UNIT            JIB        $2.25
                05/27/10 Payment, Check#    7783      Pymt       -$2.25

 3183 200-10    04/30/10 JANIAK #1 UNIT               JIB      $101.32
                05/27/10 Payment, Check#    7783      Pymt     -$101.32

 3188 200-17    04/30/10 WINTER G #1 UNIT             JIB     $3,315.16
                05/27/10 Payment, Check#    7783      Pymt   -$3,315.16

 3191 200-26    04/30/10 ALLINGTON #1                 JIB     $3,091.84
                04/30/10 Netted Against Revenue: 02/10 Net   -$1,411.65
                05/27/10 Payment, Check#    7783      Pymt   -$1,680.19

 3193 200-31    04/30/10 BEAN E 1                     JIB     $5,268.06
                04/30/10 Netted Against Revenue: 02/10 Net   -$3,843.12
                05/27/10 Payment, Check#    7783      Pymt   -$1,424.94

 3194 220-00    04/30/10 PARK PLACE                   JIB      $497.05
                05/27/10 Payment, Check#    7783      Pymt     -$497.05

 3117 220-00    05/04/10 NY Park Place Seismic        Adv.   $45,660.50

 3195 220-05    04/30/10 TUBBS #2                     JIB    $42,090.15
                04/30/10 Application of Advance       AAdv    -$7,439.92

 3196 220-06    04/30/10 EVANS #1                     JIB    $79,476.14
                04/30/10 Application of Advance       AAdv   -$70,366.73

 3109 220-07    04/09/10 Advance                      Adv.    $7,602.75

 3111 220-07    04/09/10 Advance                      Adv.   $46,397.04

 3113 220-08    04/09/10 Advance                      Adv.   $49,001.72
                                                            ----------------
                             Balance of Previous Invoices    $192,421.65*
                                                            ----------------

-------------------------New Invoices This Statement-------------------------
Invoice   Well   Trans.        Transaction           Tran    Amount
Number    Code   Date          Description           Type
-------  ------- --------  ---------------------     ----  ----------------


 3252 200-06    05/31/10 DZYBON #1 UNIT               JIB       $39.80
                05/31/10 Netted Against Revenue: 03/10 Net      -$39.80

 3253 200-09    05/31/10 HULETT #1 UNIT               JIB     $3,577.95
                05/31/10 Netted Against Revenue: 03/10 Net     -$503.77
                05/31/10 Netted Against Revenue: 03/10 Net   -$3,074.18

 3254 200-11    05/31/10 LITTLE #1 UNIT               JIB      $462.76
                05/31/10 Netted Against Revenue: 03/10 Net      -$24.74
                05/31/10 Netted Against Revenue: 03/10 Net     -$438.02

 3255 200-12    05/31/10 PIETILLA R1                  JIB       $15.65
                05/31/10 Netted Against Revenue: 03/10 Net      -$15.65
```

ACCOUNTS  RECEIVABLE  SUMMARY  STATEMENT

Owner Code:AUST01    (Continued)                          Date:06/07/10

To: AUSTIN EXPLORATION, LLC                    From: EPSILON ENERGY USA, INC.
    1100 CONRAD INDUSTRIAL DRIVE                      3343 STATE ROUTE 3004
    LUDINGTON        MI 49431                         MESHOPPEN        PA 18630

```
----------------------New Invoices This Statement----------------------
Invoice   Well    Trans.          Transaction          Tran    Amount
Number    Code    Date            Description          Type
------- ---------- -------- ---------------------------- ---- ----------------

  3256 200-14   05/31/10 SODERBLOM #1 UNIT             JIB      $13.98
               05/31/10 Netted Against Revenue: 03/10  Net     -$13.98

  3257 200-15   05/31/10 STOSCHECK #1 UNIT             JIB       $8.25
               05/31/10 Netted Against Revenue: 03/10  Net      -$8.25

  3259 200-19   05/31/10 SRA3 #1                       JIB      $20.44
               05/31/10 Netted Against Revenue: 03/10  Net     -$20.44

  3260 200-21   05/31/10 NOWLAN 1                      JIB     $425.67
               05/31/10 Netted Against Revenue: 03/10  Net     -$43.54
               05/31/10 Netted Against Revenue: 03/10  Net    -$382.13

  3261 200-25   05/31/10 RUSH D1 A                     JIB      $39.42
               05/31/10 Netted Against Revenue: 03/10  Net     -$39.42

  3262 200-26   05/31/10 ALLINGTON #1                  JIB     $400.69
               05/31/10 Netted Against Revenue: 03/10  Net    -$400.69

  3263 200-27   05/31/10 POYSA E #1                    JIB       $3.59
               05/31/10 Netted Against Revenue: 03/10  Net      -$3.59

  3264 200-30   05/31/10 WINTER G 1A (AREA 55)         JIB   $1,959.82
               05/31/10 Netted Against Revenue: 03/10  Net  -$1,959.82

  3265 200-31   05/31/10 BEAN E 1                      JIB   $1,459.85
               05/31/10 Netted Against Revenue: 03/10  Net  -$1,459.85

  3266 200-32   05/31/10 LANT #1                       JIB     $160.51
               05/31/10 Netted Against Revenue: 04/09  Net     -$38.21
               05/31/10 Netted Against Revenue: 05/09  Net     -$25.00
               05/31/10 Netted Against Revenue: 06/09  Net     -$26.05
               05/31/10 Netted Against Revenue: 07/09  Net     -$23.21
               05/31/10 Netted Against Revenue: 08/09  Net     -$23.59
               05/31/10 Netted Against Revenue: 09/09  Net     -$21.23
               05/31/10 Netted Against Revenue: 10/09  Net      -$3.22

  3270 220-07   05/31/10 LARISON #2                    JIB   $4,020.63
               05/31/10 Application of Advance        AAdv  -$4,020.63

  3271 220-08   05/31/10 E EVANS #1                    JIB     $858.44
               05/31/10 Application of Advance        AAdv    -$858.44

  3251 200-00   05/31/10 EMPIRE PROJECT                JIB   $8,614.20

  3258 200-17   05/31/10 WINTER G #1 UNIT              JIB  -$3,307.91

  3267 220-00   05/31/10 PARK PLACE                    JIB  $25,672.39

  3268 220-05   05/31/10 TUBBS #2                      JIB      $52.19

  3269 220-06   05/31/10 EVANS #1                      JIB      $52.19

                                       ----------------
                      Total New Invoices    $31,083.06*
                                       ----------------
```

A C C O U N T S   R E C E I V A B L E   S U M M A R Y   S T A T E M E N T

Owner Code:AUST01    (Continued)                              Date:06/07/10

To: AUSTIN EXPLORATION, LLC                          From: EPSILON ENERGY USA, INC.
    1100 CONRAD INDUSTRIAL DRIVE                            3343 STATE ROUTE 3004
    LUDINGTON      MI 49431                                 MESHOPPEN        PA 18630

| Invoice Number | Well Code | Trans. Date | Transaction Description | Tran Type | Amount |
|---|---|---|---|---|---|

| Current | 30 Days | 60 Days | 90 Days |
|---|---|---|---|
| $31,083.06 | $192,421.65 | $0.00 | $0.00 |

                                        Balance Due This Statement      $223,504.71**

        Due Upon Receipt

S U M M A R Y   O F   A D V A N C E S   ▭▭▭

Owner Code:AUST01                                      Date:06/07/10

To: AUSTIN EXPLORATION, LLC                            From: EPSILON ENERGY USA, INC.
    1100 CONRAD INDUSTRIAL DRIVE                              3343 STATE ROUTE 3004
    LUDINGTON     MI 49431                                    MESHOPPEN       PA 18630

--------------------------Advances Still Outstanding----------------------------

| Adv.Inv# / Date | Well Code | Transaction Description | BCP /ACP | Advance Amount | UnApplied Amount |
|---|---|---|---|---|---|
| 3117 | 220-00 | NY Park Place Seismic | BCP | $45,660.50 | $45,660.50 |
| 05/04/10 AFE:S10009 | | 2D SEISMIC DATA PARK PLACE | | | |
| 3111 | 220-07 | Advance | BCP | $46,397.04 | $36,125.78 |
| 04/09/10 AFE:D10007 | | LARISON #2 | | | |
| 3113 | 220-08 | Advance | BCP | $49,001.72 | $23,892.35 |
| 04/09/10 AFE:D10008 | | E EVANS #1 | | | |

Outstanding Advances Totals  $141,059.26  $105,678.63**

# EXHIBIT E

*Cook Investments*

|
William F. Cook Trust
Byron J. Cook Trust

May 21, 2010

Mr. Ramik Arandjelovic
Epsilon Energy USA. Inc.
3343 State Route 3004
Meshoppen, PA 18630

RE:     Notice of Default

Dear Mr. Arandjelovic,

This letter is to serve as the Non-Operating partners written notice of default in Epsilon's duties as Operator under Article V of our Joint Operating Agreement dated August 8th 2005 covering our joint operations in Steuben, Chemung, Schuyler, Tioga and Otsego Counties, New York.

Our concerns about Epsilon's ability to carry out it's duties as Operator under the agreement were first brought to Epsilon's attention in an February 8th email and accompanying letter which highlighted the loss of key Epsilon staff and questioned the ability of Epsilon to carry out all its obligations without that experienced and knowledgeable staff in place. The letter specifically noted the loss of 170 acres of leasehold and the failure to pay legal bills in a timely fashion. The letter also noted that we were about to embark on a significant Marcellus exploration program that would put even more pressure on the Epsilon staff, or lack thereof, to carry out the program. The letter made 2 specific recommendations. The first was that we move all our land operations to Western Land Services as they already were involved in the lease records and more important, they had a long history of managing the legal and technical issues associated resource plays from their experience in the Antrim play in Michigan and the CBM play Wyoming. We also proposed that an Operations Committee be established to oversee follow through of Epsilon staff and to plan for the future.

Epsilon's response to the letter was to inform us that the vacant position of Land manager was about to be filled and that person to be hired was highly qualified and therefore there was no need for Western Land Services to take over the land function. We were also promised that an Operating Committee would be formed per our request. In the 3 months since the letter was written the Operating Committee has met only once and the issues

issues surrounding Epsilon's ability to fulfill its obligations as Operator about which we had warned, have become reality.

Our specific allegations of "gross negligence or willful misconduct...material breach of or inability to meet the standards of operation contained in Article V,A.....material failure or inability to perform it's obligations under...the operating agreement", are as are follows:

- Loss of 546.072 acres of prime Marcellus development acreage because of the failure to file, in a timely fashion, the pooling declarations for the Tubbs, E. Evans, Evan and Larison wells. (see Exhibit A for the listing of leases)

  In communications with the partners and legal counsel dating as early as January 2009, Epsilon staff evaluated various methods of maintaining the JOA lease position in New York. The discussions included lease extension, claims of Force Majeure and drilling wells to HBP the acreage. Finally it was decided that the best course of action was to drill 4 wells permitted to the Oriskany which would maximize the pooling terms of the leases to HBP 640 acres per well.

  When Epsilon filled the vacancy left in the Land Manager position a conference call was held on February 23, 2010 to review the strategy and receive the advice of our New York counsel on pooling and spacing. According to the minutes of the call provided by Ramik Arandjelovic, in attendance on the call were: Zoran Arandjelovic, Dan Ward, Ramik Arandjelovic, Jeff Cook, Dave Matz, Kim March, Jeff Bechtel, Neil Greenly, Mandie Kirkpatrick, Michael Joy, John Wilson and Judith Erickson.

  Our New York Counsel, Mr. Joy led off the meeting with a discussion of pooling versus spacing. The minutes show the following:

  "Most important document are the leases themselves, need to check for pooling restrictions. Most likely 640 acre units, possibly some 320 acre restrictions

  Q. Would state-wide spacing statute supercede or limit contractual rights within lease?
  A. Normally, no. state doesn't have the power to do so

  Current units spaced as 160 acre units  Michael worked with Rich to move units around. Should now be capturing maximum acreage.

  1st: We are going to hold leases by pooling declarations. State spacing minimum is 160 acre units. Then file voluntary pooling declaration, then any physical operations will hold the leases.
  2nd: Look at individual leases and form voluntary production units. some of leases may

have 320 restrictions  Most leases did not have restrictions  and if they did, 640 acre units
Would not want to do variance application for a unit larger than 640 acres  Especially in initial stages of sGEIS adoption.
There was no dissent offered at the meeting and everyone left with the mission of holding our expiring leases by pooling them into the 640 voluntary units of the 4 proposed wells

In a March 12, 2010 email to John Wilson and Judith Erickson, Mr. Joy had specific instructions for Judith Erickson on the recording of the pooling declarations.  The email states:
"DO NOT mail in the recording documents close to the deadline. The Clerk is taking up to several weeks, or more than a month in some cases, to record. It needs to be done in person by someone who knows how to handle the recording documents in New York and the ability to make decisions at the counter if need be."

There can be no question from this email that Epsilon was to record these documents in the County Clerk's office.  In a March 30, 2010 email to Judith Erickson , John Wilson noted that the Cottle and Rumsey tracts expired on April 3rd and therefore "We need to get these declarations of record asap."  In response Judith Erickson specifically stated that "I will do the recording, thanks, Judith".

On May 5, 2010 via email Cook Investments asked for a copy of the recorded Pooling Declaration for the 4 wells.  In an email response of that same day Judith Erickson told us that "The former pooling declarations have not been received as this point. I am making an inquiry into the status of these agreements but have not received an answer back from the state."  When asked why they had been sent to the state she responded "The pooling declarations were sent to the state first and will be filed with the county upon receipt from the state.  The state filing is necessary because they have ultimate control over pooling. County filings are for notice and are not binding against the State if the State comes back and disapproves".  This is in direct violation of the instructions given at the February conference call, the March 12th email from our New York attorney.  As a result of this willful misconduct of the Epsilon Land Manager, almost 600 acres of leases have been lost and the expenditure of $1,300,000 of drilling expense has been to varying degrees wasted because of the failure to pool these leases.  The above actions constitute a material failure by Epsilon to perform its duties as Operator.

- The Epsilon Land Manager willfully misled the partners about the status of the "recording" of the Pooling Declarations.

As stated above, when asked on May 5, 2010 for copies of the Pooling Declarations, Judith Erickson told me, via email, that *"The former pooling declarations have not been received as this point. I am making an inquiry into the status of these agreements but have not received an answer back from the state.* The next day she confirmed this account by telling us that *"The pooling declarations were sent to the state first and will be filed with the county upon receipt from the state".* There can be no mistake that Ms. Erickson is telling us that as of May 5, the Pooling Declarations were already in the hand of the State of New York. In a May 7, 2010 email she once again asserts that *"The pooling declarations have not been returned. They will not be filed today".*

Finally, on May 7th I received a call from Mr. Joy to tell me of a call he got from NYSDEC director Jack Dahl. The first item that Mr. Dahl wanted to discuss was the packet of Pooling Declarations that had arrived via overnight mail from Epsilon. Clearly these Pooling Declarations were not in the possession of the State at the time Ms. Erickson wrote her email on May 5th. So, rather than admit the error Ms Erickson, instead, chose to deceive the partners. This represents a material breach of the JOA.

- The second reason for Mr. Dahl to contact Mr. Joy was to express his displeasure with repeated phone calls from Judith Erickson on Friday May 5th seeking advice on the issue of voluntary pooling. Mr. Dahl told Mr. Joy that Ms Erickson was advised that the State had no interest or oversight with regard to voluntary pooling. However, it seems that Ms. Erickson, according to Jack Dahl, didn't stop there. She proceeded to call 2 other members of the NYSDEC staff, including Linda Collart (Region 8 permits chief) and Jennifer Maglienti (f/k/a Jennifer Harle – Division of Minerals Program Counsel. Mr. Dahl also complained that in the process of the series of calls, she did not tell the second and third persons they had called the first and second persons, respectively. Mr. Dahl said that while the state didn't have any oversight on the issue, it appeared to him that Epsilon was drilling Oriskany wells with the hope of completing them up hole in the Marcellus and pooling 640 acres to HBP as much acreage as possible. Mr. Joy said that Mr. Dahl said "I don't think I like that".

Despite the specific review of our New York attorney, the agreement of all the New York partners, Ms. Erickson decided on her own to seek the counsel of the NYSDEC staff on an issue over which they themselves admit they have no regulatory oversight. In doing so, she has brought attention to an issue which should never have come before the NYSDEC and in doing so she has placed our New York drilling program and our effort to hold leases in jeopardy. If she needed advice, she should have sought the counsel of our

New York attorney. In fact she had called Mr. Joy earlier in the day and was told that the State had no regulatory interest in voluntary pooling and she wasn't to contact the State about the issue.

Ms. Erickson's reckless phone calls to the state represent a material breach of her fiduciary responsibility to the owners under the JOA. As an employee of Epsilon, her willful disregard of the advice of our New York counsel represent a material breach of the standards of operation under the JOA.

- The final problem brought to Mr. Joy's attention in the phone call with Mr. Dahl was the sloppy and incomplete paperwork being submitted to the State by Epsilon in regards to wells. According to Mr. Joy, Jack Dahl said that in many cases paperwork submitted to the state is incomplete or even at times completely missing. NYSDEC staff have complained to Mr. Dahl that Epsilon staff is asking NYSDEC to fill out the paperwork. Mr. Dahl specifically noted that applications for well permits have been submitted with the casing programs left blank. He noted that this should just be a simple cut and paste from prior wells and that if the Epsilon staff can't get something as simple as this done correctly, the NYSDEC is wondering if they are competent to operate in New York. The failure to deliver accurate and complete forms to the state, to the point of necessitating an irritated call from the Director to our attorney, represents a material failure to perform the most basic of functions of the Operator under the terms of the Operating Agreement. The threat by the NYSDEC to stop issuing permits to Epsilon creates a hazard to Epsilon's inability to perform its obligations under the JOA.

- Loss of 553,408 acres leases for failure to pay extensions in a timely fashion. See attached **Exhibit B** for the schedule of leases.

- Notice of Violation on the Tubbs Unit. Epsilon is currently out of compliance with the State of New York and is the subject of a formal notice of Violation. As a prudent Operator, it is Epsilon's obligation to perform its activities in compliance with all governmental rules and regulations.

- Confusing and contradictory proposals and advance billings indicative of sloppy work or incompetence which bring into question the Operator's ability to meet the standards of operations contained in Article V.A. of the JOA.

On April 9, 2010 Judith Erickson sent an email with elections for 4 additional wells in New York (the Walluck, Hughson, Emerson and Campbell). However,

in an email dated May 5th, 2010 Judith Erickson said "At the present time I do not believe we have immediate plans to drill the additional 4 wells, which is probably the reason the AFE's have not be sent to you."

The next day Ramik Arandjelovic sent an email to the partners requesting a meeting with the following agenda item "- Strategy going forward. has anything changed (Drilling program for next 12 months - Campbell, Emerson, Hughson, Walluk, others?)

On February 19, 2010 Dan Ward sent an email recommending the purchase of 95.18 miles of 2-D seismic data for use in the exploration program.

On February 26, 2010 John Wilson sent an email to Dan Ward on behalf of Austin and Cook Investments rejecting the proposal to purchase seismic. In a letter dated April 29, 2010, Judith Erickson again asks for approval of the same 95.18 miles of 2D seismic. This is without any communication from EPS suggesting new rationale for the seismic or any direction from the Operating Committee, which EPS had agreed to convene regularly. On May 10th Kim March sent an advance billing to the partners for this same seismic. It was rejected by Austin and Cook again.

A May 11, 2010 email from Judith Erickson requested an election on 2.54 acres of land owned by Dennis LaRue. However in an email later that day Ramik Arandjelovic noted "Judith: This is specific to the Hwy 706 project in PA. it does not concern our NY partners. Jeff. John, please disregard this e-mail

- We have drilled 4 wells in New York under the JOA and have not reached final settlement with any of the surface owners. The surface owners haven't even been spoken to in nearly 4 weeks. In a play where we need the landowners on our side, this is unacceptable. Epsilon staff has suggested that the problem lies with our lease form as it does not specify well site damages which further evidences gross incompetence. It is not customary to negotiate these damages as part of buying a lease, as most leases are not drilled. When damages are negotiated they are added to the lease in an addendum. Most important, however, is the fact that as Operator Epsilon knew, or should have known, the terms of its leases and whether damages were covered in the lease form. Waiting until after drilling has occurred exposes the joint account to unnecessary risk and expense. A prudent Operator does not let landowners sit for weeks with unsettled damages and open drillsites.

- EPS management does not know what their leasehold position in New York totals. They do not know what wells need to be drilled to hold it. They do not know how to maximize its value.   As early as 4 weeks ago Epsilon believed they had 32,000 acres of NY leasehold and had no clue as to the steps necessary to maintain that leasehold. Recent negotiations with JOA partners have highlighted those deficiencies and brought into concern whether Epsilon is in fact capable of operating, maintaining and developing the NY leasehold.

- Previous managers had begun working with East Resources on an acreage trade to consolidate our acreage position. The plan was to talk to East Resources about trading our scattered acreage in the western counties and get, in return, acreage near our Evans Hill project. In an October 26, 2009 email from Tom Rielly to Rich Collins, East expressed it's willingness to trade acreage to consolidate each company's respective lease position. In the transition of Land Managers, just as we had warned in our February letter, this important work has been dropped. It is unclear at this point if Epsilon is even aware of the work done by Mr. Collins to advance this strategy.  We have received no follow up reports from EPS staff on this very important trade. In a May 20ᵗʰ email to the partners Ramik Arandjelovic describes portions of our acreage position as trade bait, but still does not report any follow up by Epsilon staff on the proposal with East. These leases are expiring underneath us and there is no effective strategy or follow through by the Operator to protect this interest. The delay in pursuing this exchange has reduced the value of the leases. The lease interests remain scattered and now they are 6 months closer to expiration. This represents a failure to protect the interests of the joint operation parties caused directly by Epsilon's failure to execute the mutually agreed strategy.

- A key component of our strategy was to purchase a contiguous gathering system in our main acreage block.  Prior to completing that right-of-way project work was halted by EPS and key contacts sit without follow up and the right-of-way unfinished.   This at the same time Epsilon field operations are in a state of disarray and key wells remain unsettled. Epsilon's actions are making acquisition of key right-of-way much more difficult, more costly, and questionable whether a contiguous right-of-way can be achieved.

- New York leasehold is held by production by key Fortuna wells. EPS management has not closely monitored those wells nor do they have a contingency plan if a key well were to be plugged or cease production.

- Drilling operations for the recently drilled wells were unnecessarily commenced at the beginning of spring breakup which resulted in substantial

additional costs. The partners had been planning to drill wells for more than 1 year. There was plenty of time to do this work when it would not have caused this damage. In addition even at the late date Epsilon decided to barge ahead with drilling when setting conductor pipe and then waiting for road weight restrictions to be lifted before continuing drilling operations. The financial loss to the partners of this ill-advised and apparently haphazard drilling plan is well over $200,000.

- EPS has not kept up to date on NY regulations and proposed regulations and is not prepared to begin completion operations once the NY moratorium is lifted. They have not secured water rights, nor have they done any investigation into water handling and disposal needs.

This letter is written on behalf of Austin Exploration and Cook Investments as the non-operating working interest owners under the JOA and under the provisions of Artile V.B.1 thereof. As provided for in the Operating Agreement we look forward to your remedies to the default.

Sincerely,
Cook Investments

Jeffrey D. Cook

JDC\jdc

Enclosures

EXHIBIT "A" attached to Notice of Default letter dated May 21, 2010

| COUNTY | TOWNSHIP | LEASE CODE | LESSEE | LEASE DATE | EXP DATE | GROSS ACRES | NET ACRES | TYPE | LEASE STAT | MONTH PER AC | EXT PER AC | TOTAL FEE $ | EXT POUND | NET COUNTY | PAYMENT | COMMONS | TWP ACRES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TIOGA | BARTON | PAM10014 | GREEN, LUCKY & SHIRLEY | 4/13/2000 | 4/14/2010 | 28.810 | 28.810 | MEAT | PT | $ 100 | $ | 1 |  | 660.4581 | TBD | 0.1395 | 0.1395 |  |
| TIOGA | BARTON | PAM10017 | FISK, MELTON J & MONICA | 3/30/2010 | 3/31/2010 | 49.700 | 49.700 | MEAT | PT | $ 3.00 | $ | 8 |  | 640.4583 | TBD | 0.1393 |  |
| TIOGA | BARTON | WSS10093 | HUNT, WILLIAM & LYTHI | 4/2/2001 | 4/2/2010 | 113.342 | 113.342 | MEAT | PT | N/A | $ 100.00 | $ 29,466.60 |  | 651.0641 | TBD | 0.1415 |  |
| CHEMUNG | VAN ETTEN | PAM10073 | GUITE, DAVID L | 4/2/2000 | 4/2/2010 | 200.000 | 200.000 | MEAT | PT | $ 2.00 | $ | 5 |  | 648.4583 | TBD | 0.1336 |  |
| CHEMUNG | VAN ETTEN | PAM10029 | ROMAN, RONALD D & JAN | 4/2/2000 | 4/2/2010 | 66.000 | 66.000 | MEAT | PT | $ 1.00 | $ | 5 |  | 648.A0533 | TBD | 0.1336 |  |
| CHEMUNG | VAN ETTEN | PAM10105 | BANKE, BARNETT & LOU | 5/24/2000 | 5/17/2010 | 60.000 | 60.000 | PLOT | PT | $ 1.00 | $ | 5 |  | 648.A0433 | TBD | 0.1355 |  |

S48.012

EXHIBIT "B" ATTACHED TO NOTICE OF DEFAULT LETTER DATED May 21, 2010

| COUNTY | TOWNSHIP | LEASE CODE | LESSOR | LEASE DATE | EXP DATE | GROSS ACRES | NET ACRES | TYPE | LEASE STAT | DEPTH LIM | RENT PER AC | EXT PER AC | TOTAL RETS | GAS POOLING | WELLHEAD | ROYALTY | EXTENSION | OVR/ACRES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CHEMUNG | CATLIN | WSS14100 | TIPTON, ARTHUR R | 10/31/2006 | 4/1/2010 | 202.800 | 202.800 | PDUP | PF | 1745 | N/A | $1,200.00 | $ 82,560.00 | NO LIMIT | | 0.1875 | | |
| CHEMUNG | CATLIN | WSS14201 | ROVANDA, PAUL P & MARY ANN | 4/4/2007 | 4/3/2010 | 41.076 | 41.076 | PDUP | PF | 1745 | N/A | $125.00 | $ 3,692.50 | NO LIMIT | | 0.1875 | | |
| TIOGA | BARTON | WSS14001 | WESLEY, JEFFREY R & MARY JANE | 4/5/2007 | 4/4/2010 | 111.562 | 111.562 | PSMP | PF | 1745 | N/A | $125.00 | $ 13,948.00 | NO LIMIT | | 0.1875 | | |
| TIOGA | CATLIN | WSS14004 | LANGAND, RICHARD F & MARY ANN | 4/9/2007 | 4/8/2010 | 335.370 | 335.370 | PSMP | PF | 1745 | N/A | $125.00 | $ 27,115.00 | NO LIMIT | | 0.1875 | | |
| CHEMUNG | SOUTHPORT | WSS14117 | HUNLEY, DANIEL P | 4/20/2007 | 4/19/2010 | 59.600 | 59.600 | PDUP | PF | 1745 | N/A | $125.00 | $ 14,850.00 | NO LIMIT | | 0.1875 | | |
| CHEMUNG | SOUTHPORT | WSS14118 | HUNLEY, DANIEL P | 4/20/2007 | 4/19/2010 | 1.000 | 1.000 | PDUP | PF | 1745 | N/A | $125.00 | $ 750.00 | NO LIMIT | | 0.1875 | | |

# EXHIBIT F



June 10, 2010


Mr. Jeffrey Cook
Cook Investments
225 N. Lafayette Street
P.O. Box 460
Greenville, Michigan 48838


RE:   Notice of Default Letter Received May 24, 2010

Dear Mr. Cook,

We are writing in response to your letter dated May 21, 2010, claiming that Epsilon is in default of its duties as Operator (the "Letter"). Contrary to allegations in the Letter, Epsilon has performed all of its obligations under the Joint Operating Agreement of August 8, 2005 ("Joint Operating Agreement"). Epsilon has operated and continues to operate at all times as a reasonably prudent operator. Epsilon, therefore, is not in default under the Joint Operating Agreement.

## A.   Lost Acreage Allegation

Your primary allegation of default appears to be that approximately 550 acres of leased property were lost for failure to timely file pooling declarations. Your specific allegations would be better addressed to Western Land Services. While a non-operator under our Joint Operating Agreement, Western Land Services took it upon itself to prepare pooling declarations and exhibits. Western Land Services, in fact, took charge of the entire pooling package.

Epsilon and John Wilson of Western Land Services received a template of pooling declarations from Attorney Michael Joy in mid-March with instructions to modify the template for all units, attach exhibits and file. Upon receipt, John Wilson of Western Land Services took the lead in preparing all declarations for the planned pooling areas. With expiration deadlines on certain leases fast approaching, Epsilon received completed declarations from John Wilson. However, upon review, Epsilon became particularly concerned that these declarations may not be in compliance with state law in several respects and potentially exposed Epsilon to liability.

Article V of the Joint Operating Agreement specifically requires that Epsilon, as Operator, conduct activities in compliance with applicable laws and regulations. Specifically, Epsilon was concerned that the pooled acreage exceeded state limits. Were Epsilon to hastily file pooling declarations that were out of compliance with the law, it would not only expose itself to future liability, but it would put all leases in the pooled tract which depend on the pooling agreement for their continued validity in serious jeopardy. Had Western Land Services followed the original

*Epsilon Energy, Ltd.*
*Epsilon Energy, International*
*150 Jardin Drive, Suite #9*
*Concord, Ontario L4K 3P9,*
*Canada*
*Phone: 905.738.7877*
*Fax: 905.669.8220*

*Epsilon Energy USA Inc.*
*Pennsylvania Office*
*3343 State Route 3004*
*Meshoppen, PA 18630*
*Toll Free: 866.384.8774*
*Phone: 570.869.2000*
*Fax: 570.869.4444*

*Epsilon Energy USA Inc.*
*Texas Office*
*Suite 930, 10700 North Freeway*
*Houston, Texas 77037*
*Toll Free: 866.545.6555*
*Phone: 281.670.0002*
*Fax: 281.668.0985*



pooling template received from Attorney Michael Joy, Epsilon would not have been faced with this situation. However, Western Land Services took it upon itself to prepare questionable declarations which it expected Epsilon to file at the eleventh hour.

Pooling acreage in excess of state limits could expose Epsilon to wrongful pooling claims. A prudent operator does not take these risks, and Epsilon finds it ironic that one of the non-operators endorsing this allegation of default is responsible for placing Epsilon in such an untenable position.

**B.      Contacting the State Regarding the Legality of Pooling Declarations**

The Letter also complains that Epsilon land-person Judith Erickson improperly contacted the NYSDEC. Ms. Erickson's contact with the NYSDEC involved brief telephone conversations in an attempt to secure general information and clarifications. Your letter characterizes these contacts as "reckless" and a "material breach of the standards of operation under the JOA." To the contrary, contacting a governmental agency to inquire as to policies and practices is precisely what a prudent Operator should be doing. Specifically, Article V of the Joint Operating Agreement requires the Operator to conduct activities in compliance with the law.

**C.      Loss of Acreage for Failure to Pay Extensions**

The Letter also claims that leases covering approximately 550 acres were lost for failure to pay extensions, which are attached to the Letter as Exhibit B. Several of these leases fell outside the core area and at least one presented difficulties with accessibility. In light of these considerations and the current New York moratorium, the decision not to extend these leases was a matter of business judgment.

**D.      The Completeness of Paperwork Submitted to the State**

The Letter also claims that Epsilon has materially failed to perform as an operator because it submitted "sloppy and incomplete paperwork" to the state in connection with wells. The Letter, however, offers no specific support for what this entailed or when this supposedly occurred. Rather, it refers to a general complaint from a single phone conversation. Given the lack of specificity in the allegation, it is obvious that no issue of default could be supported.

**E.      Tubbs Notice of Violation**

The Letter further alleges that Epsilon is out of compliance with New York state law because it has received a notice of violation ("NOV") on the Tubbs unit. Epsilon does acknowledge receiving a NOV for a lease road on May 10, 2010. However, the NOV simply required Epsilon to stabilize the road for purposes of erosion and sediment control. Epsilon met with the inspector, reviewed the road, and immediately prepared cost estimates to bring the road into compliance with the order. Epsilon is working diligently and expects to have this minor issue resolved shortly.

*Epsilon Energy, Ltd.*
*Epsilon Energy, International*
*150 Jardin Drive, Suite #9*
*Concord, Ontario L4K 3P9.*
*Canada*
*Phone: 905.738.7877*
*Fax: 905.669.8220*

*Epsilon Energy USA Inc.*
*Pennsylvania Office*
*3343 State Route 3004*
*Meshoppen, PA 18630*
*Toll Free: 866.384.8774*
*Phone: 570.869.2000*
*Fax: 570.869.4444*

*Epsilon Energy USA Inc.*
*Texas Office*
*Suite 930, 10700 North Freeway*
*Houston, Texas 77037*
*Toll Free: 866.545.6555*
*Phone: 281.670.0002*
*Fax: 281.668.0985*



**F.   Addressing Surface Disturbance**

Next, Epsilon acknowledges your concerns regarding surface disturbance. However, Epsilon is meeting its obligations in a prudent manner. Specifically, Epsilon is in the process of evaluating damages, addressing them and reclaiming property. Further, Epsilon is in the process of receiving quotes for other surface repairs to certain roads and will implement such repairs. As you know, these are normal activities in well-site development.

**G.   Monitoring Key Fortuna Wells and Having a Contingency Plan**

The Letter also claims that Epsilon has failed to closely monitor the key Fortuna wells and does not have a contingency plan if a key well were to be plugged or cease production. Epsilon *is* reviewing and monitoring key Fortuna wells and will continue to do so.

**H.   Working with East Resources on Lease Trade and Consolidation**

The Letter further claims that work with East Resources on the trade and consolidation of acreage has apparently been dropped as there has been no follow up on Tom Rielly's e-mail from last October, expressing a willingness to move forward on this work. Epsilon is aware of this issue, will continue to monitor it, and will also continue to assess its viability in light of ongoing development strategy for the AMI as a whole.

**I.   Other Allegations**

The Letter makes several other allegations of default. However, in each instance, the Non-Operators simply make a bald assertion without providing any specific allegations from which Epsilon might form a response. These include claims that a right of way project was stopped because field operations were in "disarray," that Epsilon has no knowledge of is present leasehold position in New York, that "additional costs" were incurred because wells were drilled during spring break up, and that Epsilon is not up-to-date on New York law. As the Non-Operators raised no specific facts to support these allegations, Epsilon is unable to respond.

As you are aware, I, Ramik Arandjelovic was recently appointed New York Project Manager. In addition to organizing conference calls and suggesting joint meetings on a monthly basis, I prepared a full outline of a strategy to move forward covering both short- and long-term initiatives. This was sent to Non-Operators John Wilson and Jeffery Cook on May 20, 2010. However, the Non-Operators appear to have given little if any consideration to this strategy based on the fact that the Letter was dated the very next day.

Epsilon has met and continues to meet all obligations under the Joint Operating Agreement. While Epsilon finds it disappointing that the Non-Operators feel otherwise, at no time has Epsilon's conduct fallen short of good oilfield practice. I assure you that Epsilon is committed

*Epsilon Energy, Ltd.*
*Epsilon Energy, International*
150 Jardin Drive, Suite #9
Concord, Ontario L4K 3P9
Canada
Phone: 905.738.7877
Fax: 905.669.8220

*Epsilon Energy USA Inc.*
*Pennsylvania Office*
3343 State Route 3004
Meshoppen, PA 18630
Toll Free: 866.384.8774
Phone: 570.869.2000
Fax: 570.869.4444

*Epsilon Energy USA Inc.*
*Texas Office*
Suite 930, 10700 North Freeway
Houston, Texas 77037
Toll Free: 866.545.6555
Phone: 281.670.0002
Fax: 281.668.0985



**EPSILON**
*Energy*

to the continued success of the New York project for all involved.  As always, should you have any questions please do not hesitate to contact me.

Sincerely,

Ramik Arandjelovic
New York Project Manager

| Epsilon Energy, Ltd. | Epsilon Energy USA Inc. | Epsilon Energy USA Inc. |
| --- | --- | --- |
| *Epsilon Energy, International* | *Pennsylvania Office* | *Texas Office* |
| 150 Jardin Drive, Suite #9 | 3343 State Route 3004 | Suite 930. 10700 North Freeway |
| Concord, Ontario L4K 3P9. | Meshoppen, PA 18630 | Houston, Texas 77037 |
| Canada | Toll Free: 866.384.8774 | Toll Free. 866.545 6555 |
| Phone: 905.738.7877 | Phone: 570.869.2000 | Phone: 281.670.0002 |
| Fax: 905.669.8220 | Fax: 570.869.4444 | Fax: 281.668.0985 |